1 | DANIEL CARLOS GARCIA
1920 Boston Way,
2 | Modesto, CA 95355-8918
Tel. No.: (442) 324-3740
3 | DanielCarlosGarcia@comcast.net

4 | Plaintiff pro se

**FILED**

**JAN 0 7 2021**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

6 | **UNITED STATES DISTRICT COURT**

7 | **FOR THE EASTERN DISTRICT OF CALIFORNIA**

**(SACRAMENTO DIVISION)**

9 | DANIEL CARLOS GARCIA,

CASE NO.:

10 | Plaintiff,

**2:21 - CV - 0 0 3 6 KJM KJN PS**

11 | vs.

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985)**

12 | CITY AND COUNTY OF SACRAMENTO, CALIFORNIA; JOHN MCGINNESS; DANIEL HAHN; RICK BRAZIEL; RICHARD (RICK) GAUTIER;
13 | STEVE HANSEN; RICHARD HITCHCOCK; STEVE GLEN; A. RICHARDSON; D. POIRIER; JOHN DOE 1; JOHN/JANE DOES 2-20,

**DEMAND FOR JURY TRIAL**

15 | Defendants.

17 | Through this verified complaint, plaintiff DANIEL CARLOS GARCIA hereby alleges as follows:

18 | **INTRODUCTION**

19 | 1.      This civil rights lawsuit is brought by plaintiff Daniel Carlos Garcia pursuant to 42 U.S.C. §1983

20 | against all Defendants for actions under color of state law in violation of Plaintiff's clearly established rights under

21 | the laws and Constitution of the United States.

22 | 2.      This suit arises from events that took place in March 2009, when Mr. Garcia was arrested by

23 | detectives from the Sacramento Police Department pursuant to an out-of-county arrest warrant issued in Riverside

24 | County in criminal case no. INF-064492. While attempting to execute the warrant to arrest Mr. Garcia, detectives

25 | made unlawful entry into a third party's private residence without a search warrant. After taking Mr. Garcia into

26 | custody without incident, the detectives remained on the scene for approximately 30 minutes while they conducted

27 | an extensive search of the entire residence and seized voluminous personal property without a search warrant or

28 | probable cause.

3.      Furthermore, detectives proceeded to conduct an **un-*Mirandized*** interrogation of Mr. Garcia about evidence pertaining to the charged offenses. Mr. Garcia's unlawfully obtained statement and derivative evidence was used to form the basis of the filing of additional charges—including capital murder. Despite repeated requests, Mr. Garcia was never shown a copy of the arrest warrant or informed of the charges.

4.      After being booked into the Sacramento County Jail, Mr. Garcia was denied adequate medical care, denied the right to call his attorneys, and repeatedly moved to new locations in order to frustrate his access to counsel. Mr. Garcia was never brought before a local magistrate for arraignment as required by state law, nor informed of this right in writing. He was not allowed to post bail and was held incommunicado for five days before being placed on a bus in the middle of the night and transported 500 miles to Riverside County.

5.      Once in Riverside, Mr. Garcia was again subjected to an unlawful custodial interrogation without the knowledge, presence, or consent of his attorneys. He was further detained for an additional three days before finally being arraigned on March 16, 2009—seven days after his arrest.

6.      In addition, Defendants unlawfully converted Mr. Garcia's extremely valuable property— including tens of thousands of dollars' worth of jewelry, electronics, luggage and other personal effects—knowing said property had been unlawfully seized. Consequently, Mr. Garcia was denied access to, and the use of, his private property, including the design and source code for his proprietary software system called *The Hydra Project* which was designed to assist law enforcement agencies and private companies detect and track child pornography and other illicit content over the internet. Defendants' tortious interference prevented Mr. Garcia from pursuing lucrative contracts potentially worth tens of millions of dollars. Despite repeated demands, none of Mr. Garcia's personal property has been returned to him and continues to be unlawfully withheld.

7.      As a direct and proximate result of Defendants' unlawful and egregious conduct, Mr. Garcia was falsely accused, and charged with murder, maliciously prosecuted, wrongfully convicted, sentenced to life in prison without the possibility of parole, and spent over eleven years and eight months imprisoned for a crime he did not commit—the alleged 2008 murder of Clifford Lambert.

8.      On June 8, 2020, Mr. Garcia's unlawful conviction was finally overturned in full when his *unopposed* petition for a writ of habeas corpus was finally granted in the Superior Court for Riverside County in consolidated case nos. RIC-1604066 and RIC-1720070. This lawsuit promptly followed.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL          PAGE 2

**JURISDICTION**

9.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §1331 over the claims arising out of violations of the United States Constitution.

10.     The jurisdiction of this Court is conferred by 28 U.S.C. §1343, which provides for original jurisdiction of this Court in suits authorized under 42 U.S.C. §1983 for civil rights actions, and §1985 for conspiracy to interfere with civil rights, to redress the deprivation under color of state law, statute, ordinance, regulation, custom, or usages of any right, privilege, or immunity secured by the Constitution of the United States or by any act of Congress providing for equal rights of all persons within the jurisdiction of the United States.

11.     This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§2201 and 2202 and is empowered to grant injunctive relief pursuant to Federal Rules of Civil Procedure No. 65.

12.     This Court has supplemental jurisdiction over Plaintiff's pendent California state law claims pursuant to 28 U.S.C. §1367(a).

**VENUE**

13.     Pursuant to 28 U.S.C. §1391(b), venue is proper in the Eastern District of California, the judicial district in which the claims in this action arose, where Plaintiff is currently detained, and in which the Defendants either reside or are employed.

**PARTIES**

14.     Plaintiff DANIEL CARLOS GARCIA is, and at all times relevant herein was, an individual residing in the State of California, and a citizen of the United States.

15.     Defendant CITY AND COUNTY OF SACRAMENTO is, and at all times relevant herein was, a public entity existing within the State of California. At all times relevant to this action, the Sacramento Police Department and the Sacramento County Sheriff's Department are and were a part of the City and County of Sacramento.

16.     Defendant JOHN McGINNESS is the former Sheriff of the County of Sacramento, a position he held from approximately 2006 through 2010. In March 2009, during the time of Plaintiff's arrest Defendant McGinness had ultimate responsibility for the promulgation and implementation of the Sheriff Department's policies, procedures, and practices and for the management of the Sacramento County Sheriff's Department and its county jails. At all relevant times herein, Defendant McGinness acted under color of state law and is being sued in

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL          PAGE 3

1    his individual capacity for damages associated with violations of clearly established federal and state rights. Upon

2    information and belief, Defendant McGinness is a resident of the State of California and of this judicial district.

3         17.    Defendant DANIEL HAHN is the current Chief of Police for the City of Sacramento, a position

4    he has held since approximately August 2017. As Police Chief, Defendant Hahn has ultimate responsibility for the

5    promulgation and implementation of the Police Department's policies, procedures, and practices and for the

6    management, supervision, training, and discipline of all subordinate employees under his command. At all relevant

7    times herein, Defendant Hahn has acted under color of state law and is being sued in his **official capacity only** and

8    for prospective injunctive and declaratory relief as permitted by federal and state law. Upon information and belief,

9    Defendant Hahn is a resident of the State of California and of this judicial district.

10        18.    Defendant RICK BRAZIEL is the former Chief of Police for the City of Sacramento, a position

11    he held from approximately 2008 to December 2012. In March of 2009, during Plaintiff's arrest, Defendant Braziel

12    had ultimate responsibility for the promulgation and implementation of the Police Department's policies,

13    procedures, and practices, and for the management, supervision, training and discipline of all subordinate

14    employees of the Police Department to ensure their compliance with all statutes, ordinances, regulations, policies,

15    customs, and usages of the City and County of Sacramento and the State of California. At all relevant times herein,

16    Defendant Braziel acted under color of state law and is being sued in his individual capacity for damages

17    associated with violations of clearly established federal and state rights. Upon information and belief Defendant

18    Braziel is a resident of the State of California and of this judicial district.

19        19.    Defendant RICHARD (RICK) GAUTIER was, at all relevant times herein, a duly appointed and

20    acting supervisor of the Sacramento Police Department. In March 2009, during Plaintiff's arrest, Defendant Gautier

21    was assigned as the Sergeant of the Sacramento Police Department's Career Criminal Apprehension Team (CCAT),

22    a kind of special fugitive task force. As Sergeant, Defendant Gautier was responsible for the management,

23    supervision, training, and discipline of all subordinate officers of his unit under his command. At all relevant times

24    herein, Defendant Gautier was acting under color of state law and in his individual capacity under the scope of his

25    employment pursuant to the statutes, ordinances, regulations, policies, customs, and usages of the City and County

26    of Sacramento, and the State of California. Upon information and belief, Defendant Gautier is a resident of the State

27    of California and of this judicial district.

28        20.    Defendant STEVE HANSEN was, at all relevant times herein, a Detective of the Sacramento

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL          PAGE 4

1   Police Department, who as a member of the CCAT was assigned to locate and arrest Plaintiff pursuant to the out-

2   of-county arrest warrant issued in Riverside County criminal case no. INF064492. At all relevant times herein,

3   Defendant Hansen was acting under color of state law and in his individual capacity under the scope of his

4   employment pursuant to the statutes, ordinances, regulations, policies, customs, and usages of the City and County

5   of Sacramento, and the State of California. Upon information and belief, Defendant Hansen is a resident of the

6   State of California and of this judicial district.

7          21.    Defendant RICHARD (RICK) HITCHCOCK was, at all relevant times herein, a Detective of the

8   Sacramento Police Department, who as a member of the CCAT was assigned to locate and arrest Plaintiff pursuant

9   to the out-of-county arrest warrant issued in Riverside County criminal case no. INF064492. At all relevant times

10  herein, Defendant Hitchcock was acting under color of state law and in his individual capacity under the scope of

11  his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usages of the City and

12  County of Sacramento, and the State of California. Upon information and belief, Defendant Hitchcock is a resident

13  of the State of California and of this judicial district.

14         22.    Defendant STEVE GLEN was, at all relevant times herein, a Detective of the Sacramento Police

15  Department, who as a member of the CCAT was assigned to locate and arrest Plaintiff pursuant to the out-of-

16  county arrest warrant issued in Riverside County criminal case no. INF064492. At all relevant times herein,

17  Defendant Glen was acting under color of state law and in his individual capacity under the scope of his

18  employment pursuant to the statutes, ordinances, regulations, policies, customs, and usages of the City and County

19  of Sacramento, and the State of California. Upon information and belief, Defendant Glen is a resident of the State

20  of California and of this judicial district.

21         23.    Defendant A. RICHARDSON, badge no. 6705, was, at all relevant times herein, a police officer

22  of the Sacramento Police Department, who was a property officer that released to Palm Springs Police Detective

23  Frank Browning all of Plaintiff's property.

24         24.    Defendant D. POIRIER, badge no. 6313, was, at all relevant times herein, a police officer of the

25  Sacramento Police Department who received the request from Detective Hansen on March 17, 2009 to release all of

26  Plaintiff's property to Palm Springs Police Detective Frank Browning.

27         25.    Defendant JOHN DOE 1 was, at all relevant times herein, a Captain for the Sacramento County

28  Sheriff's Department, who in 2009 was assigned as the commander of the Downtown Sacramento County Jail. As

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL          PAGE 5

1    jail commander, Defendant Doe 1 was a duly appointed and acting supervisor of the Sheriff's Department

2    responsible for the management, supervision, training, and discipline of all subordinate employees of the Sheriff's

3    Department to ensure their compliance with all statutes, ordinances, regulations, policies, customs, and usages of

4    the City and County of Sacramento and the State of California. At all relevant times herein, Defendant Doe 1 acted

5    under color of state law and is being sued in his individual capacity for damages associated with violations of

6    clearly established federal and state rights. Upon information and belief Defendant Doe 1 is a resident of the State

7    of California and of this judicial district.

8         26.    The true names and capacities whether individual, official, corporate, associate, or otherwise, of

9    the Defendants named herein as JOHN/JANE DOES 2 through 20, inclusive, and each of them, are presently

10   unknown to Plaintiff who therefore sues them by fictious names. Plaintiff is informed and believes, and therein

11   alleges, that each of the Doe Defendants is in some manner responsible for the actions and damages alleged in this

12   verified complaint. When Plaintiff ascertains the true names and capacities of the Doe Defendants, he will seek

13   leave of Court to amend this complaint to identify them by their true names and capacities. Doe Defendants are

14   believed to have been employed by the City and County of Sacramento, the Sacramento Sheriff's Department, or

15   the Sacramento Police Department.

16        27.    Plaintiff is informed and believes, and therein alleges, that at all times mentioned herein, the

17   Defendants named herein, and each of them, were the agents, servants, co-conspirators, or employees of the other

18   Defendants and that all of the acts alleged to have been done by each Defendant were done in that Defendant's

19   capacity as agent of the other Defendants, within the scope of the Defendant's authority as agent, servant,

20   co-conspirator, or employee and with the permission and consent of the other Defendants.

21                                    **LACK OF QUALIFIED IMMUNITY**

22        28.    It is anticipated that the Defendants will likely claim that they enjoy qualified immunity from suit

23   for each of the causes of action stated in this verified complaint—however, they do not.

24        29.    The doctrine of qualified immunity shields officials from civil liability so long as their conduct

25   "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have

26   known.'" (*Pearson v. Callahan* (2009) 555 U.S. 223, 231.)

27        30.    A clearly established right is one that is "'sufficiently clear that every reasonable official would

28   have understood that what he is doing violates that right.'" (*Reichle v. Howards* (2012) 566 U.S. 658.)

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL          PAGE 6

1    31.    "Qualified immunity gives government officials breathing room to make reasonable but mistaken

2    judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" (*Ashcroft v. al-*

3    *Kidd* (2011) 563 U.S. 731, 743.)

4    32.    The Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith

5    acts and omissions would be understood by any reasonable official to be in violation of the clearly established rights

6    of Plaintiff as secured by the laws and Constitutions of the United States and the State of California. As such, they

7    have forfeited any claim of qualified immunity protection.

8                                    **TIMELINESS OF ACTION**

9    33.    It may be argued that the acts and omissions that give rise to the causes of action described herein

10    are beyond the applicable statute of limitations; however, they are not. It has been well established by the Supreme

11    Court that Section 1983 relief is unavailable for recovering damages on claims that necessarily imply the invalidity

12    of the plaintiff's underlying criminal conviction or sentence unless the plaintiff can demonstrate that the

13    "conviction or sentence has been reversed on direct appeal, expunged by executive order, [invalidated by an

14    authorized state tribunal], or called into question by a federal court's issuance of a writ of habeas corpus." (*Heck v.*

15    *Humphrey* (1994) 512 U.S. 477, 487; see also *Guerrero v. Gates* (9th Cir. 2006) 442 F.3d 697, 703-04 (no

16    cognizable §1983 claim for wrongful arrest, malicious prosecution, and conspiracy to bring false charges because

17    claim challenged sentence, but conviction never invalidated.).)

18    34.    If a Section 1983 action would necessarily challenge the legality of a conviction or sentence on a

19    criminal charge, the statute of limitations for the Section 1983 action may be temporarily tolled until a disposition is

20    reached in the criminal proceedings. (See, e.g., *Johnson v. Winstead* (7th Cir.. 2018) 900 F.3d 428, 435 (§1983

21    claim for violation of Fifth Amendment right against self-incrimination would not accrue until after conviction

22    reversed); *Jackson v. Barnes* (9th Cir. 2014) 749 F.3d 755, 760.)

23    35.    Plaintiff was convicted in the underlying criminal case and sentenced to life imprisonment.

24    Plaintiff's malicious prosecution, wrongful conviction, and unlawful imprisonment was a direct and proximate

25    result of the egregious conduct of the Defendants as described herein. A favorable judgment on Plaintiff's Section

26    1983 claims would therefore have conflicted with the validity of Plaintiff's criminal conviction. Therefore, the

27    statute of limitations was necessarily tolled during the pendency of Plaintiff's unlawful incarceration and the claims

28    raised herein did not accrue until his conviction was reversed and sentence vacated.

36. On June 8, 2020, Plaintiffs conviction in case no. INF-064492, before the Superior Court for Riverside County was reversed in full upon the granting of his *unopposed* petition for a writ of habeas corpus. On July 23, 2020, Superior Court Judge David A. Gunn issued an order vacating Plaintiff's judgment of conviction and sentence in full. Therefore, each of the causes of action as raised herein did not accrue until Plaintiff's criminal conviction and sentence were vacated. This lawsuit was timely filed within the applicable statute of limitations as tolled.

## FACTUAL ALLEGATIONS

**I.    Background of Plaintiff Daniel Carlos Garcia**

37. Plaintiff Daniel Carlos Garcia was born and raised in Northern California. Mr. Garcia is a lifelong resident of California and a citizen of the United States.

38. In 2001, Mr. Garcia moved to San Francisco to pursue his career in the computer technology sector. After working for several years for various biomedical and technology companies, Mr. Garcia began to develop his own innovative software applications and technology platforms.

39. Mr. Garcia had no criminal convictions on his record prior to his arrest by Sacramento Police in 2009 and the resulting conviction following a lengthy jury trial in Riverside County in 2012.

**II.    The Thomas White Affair**

40. Mr. Garcia was at all times represented by counsel.  In October 2002, Mr. Garcia retained attorneys John Edward Hill and David Replogle (hereafter "Replogle") to represent him in a civil lawsuit against a man who had molested Mr. Garcia as an adolescent. The defendant in that case was wealthy San Francisco businessman Thomas Frank White (hereafter "White") who fled the United States becoming an international fugitive. In July 2005, Mr. Garcia's civil lawsuit against White was settled and Mr. Garcia received a seven-figure settlement.[1] Both attorneys John Hill and David Replogle continued to represent Mr. Garcia in various capacities in several other matters and were available to Mr. Garcia should any new legal matters arise. The fact that Mr. Garcia was represented at all times by counsel was well-known to law enforcement.

41. Mr. Garcia assisted several law enforcement agencies, including the Federal Bureau of

---

[1] Thomas White also voluntarily settled two lawsuits on behalf of twenty-one other victims that he had sexually abused.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL          PAGE 8

1   Investigation, Interpol, Thai Royal Police, Mexican Federal Police, and the San Francisco Police Department, in

2   investigating and apprehending White. With the help of Mr. Garcia, on February 13, 2003, White was arrested in

3   Thailand. White fought extradition to the United States where he was wanted on federal crimes under a federal

4   grand jury indictment for production of child pornography and sexual tourism (U.S. Protection of Children from

5   Sexual Predators Act (PROTECT Act) of 2003). White renounced his U.S. citizenship in an attempt to avoid

6   extradition back to the United States. White was eventually extradited to Mexico in 2005, convicted on several

7   counts of child molestation, and subsequently died in prison in Mexico in 2013.

8         42.    Mr. Garcia provided information to San Francisco Police Inspector Gregory Ovanessian

9   (hereafter "Inspector Ovanessian") to assist law enforcement in investigating White. Inspector Ovanessian was also

10  investigating an exchange student from Nepal named Kaushal Niroula (hereinafter "Mr. Niroula") for various

11  crimes in the San Francisco Bay Area and met with Mr. Garcia numerous times as a witness against Niroula. Mr.

12  Garcia had been a valuable witness for Inspector Ovanessian for several years helping him in the investigation and

13  prosecution of Niroula and others for several crimes. Mr. Garcia had always provided reliable information to law

14  enforcement. Inspector Ovanessian was aware that Mr. Garcia was represented by counsel.

15  **III.    The Hydra Project**

16        43.    As a survivor of childhood sexual abuse, Mr. Garcia was passionate about protecting children

17  from sexual predators. Mr. Garcia worked with his attorney David Replogle to found a non-profit organization

18  called Campaign Against Child Exploitation (CACE) to help bring awareness to and combat child sexual abuse in

19  the United States and abroad.

20        44.    Mr. Garcia, together with Mr. Replogle,  built upon the relationships with various law

21  enforcement and government agencies around the world that they had forged while helping to apprehend and

22  prosecute Thomas Frank White. They advocated for stricter laws and greater penalties against those who sexually

23  abuse children, and better enforcement of existing laws. Mr. Garcia and Mr. Replogle also provided direct aid to

24  victims of child sexual assault and assisted survivors to seek appropriate legal action against their abusers.

25        45.    Mr. Garcia desired to use his computer savvy and technical expertise to help combat child sexual

26  abuse by targeting those who produce and distribute child pornography. In 2003, he teamed up with his best friend

27  and computer security expert Alexander Shahbazian to develop an innovative system that could detect and track the

28  spread of child pornography (and later expanded the search for other kinds of illicit content), over then-popular

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL          PAGE 9

peer-to-peer (P2P) file sharing networks. They named their efforts *The Hydra Project*.

46.    By late 2005, Messrs. Garcia and Shahbazian had developed a working prototype of *The Hydra Project* to prove their concept. They had designed the system as a scalable hive-network based on Microsoft xBox gaming systems. Each of the xBox units functioned as a kind of "worker bee" or "drone" to share the workload of the "hive" as a whole. The system would then "swarm" the P2P networks in a coordinated effort to search for and detect illicit files such as child pornography and terrorist materials. If a match was found, the individual drone would report the results back to the control unit or "queen" and an incident report would be generated detailing the date, time, location, system configuration, and match found.

47.    Mr. Garcia's innovative design proved to be incredibly effective, and during initial testing, successfully detected and identified over 200,000 individual computer systems around the world that possessed child pornography. Mr. Garcia then began sharing the results with various law enforcement agencies around the world and seeking their input on additional features and functions they would find useful. A system similar to *The Hydra Project* was developed by technology entrepreneur Hank Asher and Seisint Technologies and reportedly was sold in 2004 for a reported $775 million dollars to Reed Elsevier.

48.    Mr. Garcia completely self-funded the development of *The Hydra Project* using his own savings and financial resources he had received in the White settlement. By early 2008, Mr. Garcia began to plan the development and release of a commercially viable version of *The Hydra Project* and sought additional partners and venture capital funding necessary to finance the expansion and costly acquisition of new equipment.

**IV.    Mr. Garcia's Friendship with Clifford Lambert**

49.    In late 2005, Mr. Garcia travelled to Beverly Hills to attend a charity gala to raise money for various causes pertaining to HIV/AIDS awareness, research, and palliative care. While at the event, Mr. Garcia met a man named Travis Hobbs Lambert and his partner Clifford Lambert. Following the gala, Mr. Garcia remained in contact with Travis Hobbs Lambert over social media until he suddenly stopped receiving replies.

50.    In March 2008, Mr. Garcia received an on-line message from Clifford Lambert who informed Mr. Garcia that Travis had died in a tragic swimming pool accident the year before. Mr. Lambert offered to fly Mr. Garcia down to visit at his home in Palm Springs and Mr. Garcia accepted. The two struck up a friendship and found many common interests.

51.    Following Mr. Garcia's first trip to Palm Springs in April 2008, he traveled several more times

1   throughout the year to visit with Mr. Lambert. During the visits, Mr. Garcia brought Mr. Lambert flowers, went

2   grocery shopping, cooked meals, helped with household repairs, solved technical problems, and generally assisted

3   Mr. Lambert with keeping his affairs in order. The men also discussed Mr. Garcia's business venture *The Hydra*

4   *Project* and a separate effort to take over a struggling waste conversion and alternative energy company called

5   Startech. Mr. Lambert offered to introduce Mr. Garcia to some of his wealthy and celebrity friends who might be

6   interested in investing in either venture.

7           52.     Mr. Garcia last spoke to Mr. Lambert on the telephone in early December 2008, at which time

8   Mr. Lambert stated he would be traveling abroad to Mexico and Austria for the holidays but would return in January

9   2009 in time for his birthday. Mr. Lambert claimed he was about to inherit millions of dollars from an old friend and

10  would soon be rich again.

11          **V.      Mr. Garcia's Relocation to Sacramento**

12          53.     In September 2008, Mr. Garcia relocated to the City of Sacramento and leased a luxury loft

13  located at 1530 J Street, Unit 310. Mr. Garcia chose the location—only two blocks from the State Capitol—to be

14  close to lawmakers and other government officials as he prepared to demonstrate *The Hydra Project*'s capabilities.

15          54.     Mr. Garcia updated his address with the California Department of Motor Vehicles to his new

16  Sacramento address.

17          **VI.     The Disappearance of Clifford Lambert**

18          55.     On December 7, 2008, Palm Springs resident, Clifford Lambert, was reported missing to police.

19  Mr. Lambert's personal attorney, Martina Kang-Ravicz obtained an emergency conservatorship over Mr. Lambert's

20  estate and the Superior Court appointed Kenneth Jenkins as the conservator. Suspicious activity in some of

21  Mr. Lambert's financial accounts during the month of December 2008 was discovered by Mr. Jenkins.

22          56.     On January 7, 2009, Miguel Bustamante was arrested on suspicion of burglary while attempting

23  to remove items from Mr. Lambert's home. Mr. Bustamante reportedly made statements to police allegedly

24  implicating a "Danny Garcia" and several others in various financial crimes against Mr. Lambert; however, he told

25  detectives he did not know Danny Garcia, nor had he ever met him or communicated with him in any way.

26          57.     There was no credible evidence implicating Mr. Garcia in the commission of any crimes against

27  Mr. Lambert or in having any involvement in his disappearance. At no time did police attempt to contact Mr.

28  Garcia to question him before seeking criminal charges against him.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL          PAGE 11

**VII.    Arrest Warrant Issued for Mr. Garcia**

58.    On March 2, 2009, Palm Springs Police Detective Simon Min (hereafter "Min") submitted a declaration in support of an arrest warrant for Mr. Garcia and several others, in the case of *People v. Daniel Carlos Garcia, et al.,* case number INF064492, Superior Court of California, County of Riverside, Indio Branch.

59.    Detective Min declared he was "assigned to investigate allegations that the above named defendant did commit the offense of PC 182(a)(4)-Conspiracy to commit theft and/or defraud, PC 368(D)-Elder abuse for theft over $400.00, PC 484g-Unlawful use of access/debit card, PC 532(a)-Obtain money by false pretense, in the City of Palm Springs, County of Riverside, on December 6, 2008."

60.    Detective Min declared that he and Palm Springs Police Detective Frank Browning (hereafter "Detective Browning"), were the primary detectives investigating the case involving the disappearance of Palm Springs resident Clifford Edward Lambert (hereafter "Mr. Lambert") and possible conspiracy to commit financial crimes against Mr. Lambert.

**VIII.    Felony Complaint Filed by Riverside County**

61.    On March 2, 2009, the Riverside County District Attorney filed a Felony Complaint in Case No. INF064492 against Mr. Garcia and others for various fraud and theft-based offenses against Mr. Lambert. Murder was not charged or alleged at that time. The Court issued an arrest warrant for Mr. Garcia and others, at the specific request of Detective Min, and set bail at one million dollars—two hundred times the amount specified in the Riverside County Bail Schedule for a non-serious, non-violent felony. Detectives from the Palm Springs Police Department actively began searching for each of the named Defendants to take them into custody pursuant to the arrest warrants.

62.    The filing of the felony complaint by the Riverside County District Attorney's Office, and the issuance of an arrest warrant, initiated a criminal action against Mr. Garcia on March 2, 2009 in Case No. INF064492.

63.    Formal charges were filed against Mr. Garcia by way of a felony complaint, triggering Mr. Garcia's Sixth Amendment right to counsel, which he exercised by retaining private counsel to represent him. Both law enforcement and the Riverside County District Attorney were aware that Mr. Garcia had been charged and was represented by private counsel and had expressed his desire to interface with the government through his attorneys which legally precluded any efforts to interview him.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL          PAGE 12

**IX.    Arrest of Mr. Garcia's Attorney David Replogle**

64.    On March 2, 2009, codefendants David Replogle and Kaushal Niroula were arrested while attending court in San Francisco. When Mr. Replogle was interviewed by Detective Browning, he stated that he represented Mr. Garcia as his attorney.

65.    Inspector Ovanessian and Detective Browning executed search warrants at Mr. Replogle's home and law offices, and knowing he was an attorney, used a special master to collect the evidence in order to preserve any attorney-client privileges.

66.    Mr. Garcia learned of the charges filed against him and the existence of the felony arrest warrant when he called the Riverside Superior Court to inquire about Replogle's arrest.

**X.    Mr. Garcia Sought the Assistance of Counsel**

67.    Upon learning of the arrest warrant, Mr. Garcia called and spoke to his attorney John Edward Hill and sought legal advice. Attorney Hill advised Mr. Garcia not to speak to the police without counsel present. Attorney Hill referred Mr. Garcia to San Francisco criminal defense attorney Tim Palm for assistance in dealing with the Riverside criminal charges. Mr. Garcia's mother privately retained attorney Tim Palm on Mr. Garcia's behalf to provide legal advice regarding the pending criminal charges in Riverside County.

68.    Attorney Palm also recommended that Mr. Garcia retain local counsel Mario Rodriguez (hereafter Mr. Rodriguez), who was a specialist in criminal law, to represent Mr. Garcia in the criminal case pending in Riverside County.

**XI.    Mr. Garcia Privately Retained Attorney Mario Rodriguez**

69.    On March 6, 2009, Mr. Garcia called and spoke to criminal defense attorney Mario Rodriguez, who agreed to represent Mr. Garcia in the criminal case. Mr. Rodriguez advised Mr. Garcia not to speak to law enforcement outside of his presence and to allow him to interface with law enforcement on his behalf.

70.    Attorney Mario Rodriguez advised Mr. Garcia not to turn himself in at that time. He advised Mr. Garcia to allow his attorneys to contact the Riverside County District Attorney's Office to attempt to rescind the arrest warrant in exchange for Mr. Garcia's voluntary cooperation, or in the alternative to arrange for a voluntary surrender after pre-posting the bail to minimize the length of time Mr. Garcia would have to spend in jail.

71.    On March 9, 2009, prior to Mr. Garcia's arrest in Sacramento, Mr. Garcia again called attorney Mario Rodriguez and officially hired him to defend him on all charges in this case by telephone agreement. Mr.

1  Garcia spoke to Mr. Rodriguez to confirm the terms of the retainer agreement, and to discuss the case. Mr.

2  Rodriguez again advised Mr. Garcia not to speak with law enforcement. Mr. Rodriguez confirmed that charges had

3  been filed against Mr. Garcia by means of a felony complaint, and that he would be calling the District Attorney to

4  discuss the case. Mr. Rodriguez also told Mr. Garcia that he would be attending Court at the Larson Justice Center

5  for the arraignment of codefendants Replogle and Niroula later that day to talk to the assigned prosecutor.

6      **XII.**    **Mr. Garcia Informed Police that He Had Retained Counsel**

7          72.    On March 4, 2009, Mr. Garcia called and spoke to Inspector Ovanessian. During the recorded

8  phone call, Mr. Garcia explained to Inspector Ovanessian that there must be a misunderstanding and that the charges

9  against him were without merit. Inspector Ovanessian put Detective Frank Browning on the call. Mr. Garcia asked if

10  Detective Browning could contact the Riverside County District Attorney to recall the arrest warrant to allow Mr.

11  Garcia to come in for questioning without arrest. Detective Browning told Mr. Garcia that he would try to contact

12  the assigned prosecutor.

13          73.    Mr. Garcia repeatedly called and spoke to Inspector Ovanessian and Detective Browning to keep

14  up-to-date on any developments and to ensure them that he would not flee and that he intended to voluntarily

15  surrender with the assistance of counsel.

16          74.    Detective Browning prepared a "Supplemental Report" on his investigation of Mr. Garcia in

17  Palm Springs Police Department case number 0812P-1307, in which he states that Mr. Garcia informed him and

18  Inspector Ovanessian in a recorded conversation that Mr. Garcia was attempting to obtain bail money and was

19  making arrangements with his attorney to voluntarily surrender to law enforcement:

20        3/4/09
21        Daniel Garcia called San Francisco Inspector Greg Ovanessien (sic) on his office phone stating that he was aware of Niroula's arrest and that there was currently a warrant out for his arrest. During his

22        conversation with Inspector Ovanessien (sic) Garcia told him that he and Lambert were good friends and that Lambert was going to help him with his Startek business. He stated that Russell Manning was being held in a jail in Porta Vallarta (sic) Mexico. Garcia did not want to turn himself in and stated he would

23        attempt to collect the bail needed before making arraignments (sic) with his **attorney** so he could surrender to law enforcement. During these conversations Inspector Ovanessien (sic) handed me the

24        phone and allowed me to speak with Garcia. Garcia told me that Replogle and Niroula were the ones responsible for Lambert's disappearance and that he would not put it past Niroula and Replogle in having

25        Lambert placed in jail in "a third world country." These phone calls were **recorded** with the recording being placed into evidence.

26        (Supplemental Report dated 3/23/2009, emphasis added)

27      **XIII.**    **Detective Browning Acknowledged He Could Not Speak to Mr. Garcia Who Was Represented by Counsel**

28          75.    On March 6, 2009, Mr. Garcia again telephoned Inspector Ovanessian to inform him that he had

1    retained counsel to defend the charges. Inspector Ovanessian informed Mr. Garcia that he was hooking up the

2    conversation he was recording to include Detective Browning, and Mr. Garcia informed the officers that he had

3    retained counsel who would be making arrangements with the Riverside County District Attorney's Office to

4    arrange for a voluntary surrender on Monday, March 9, 2009. Detective Browning became hostile towards Mr.

5    Garcia and stated that he would have a "man hunt" for Mr. Garcia if he did not turn himself in <u>immediately</u>.

6          76.      Mr. Garcia informed Detective Browning that his retained counsel would be handling the case

7    moving forward and had advised Mr. Garcia not to talk to the police. Detective Browning acknowledged that he

8    could not speak to Mr. Garcia if he was represented by an attorney and hung up the phone. That was the last call

9    between Mr. Garcia and Detective Browning.

10    **XIV.**     **Palm Springs Police Department Requested the Assistance of the Sacramento Police Department**

11          77.      Palm Springs Police Detective Simon Min requested the assistance of the Sacramento Police

12    Department in apprehending Mr. Garcia. Detective Min had received a response from AT&T to a search warrant for

13    phone records associated with Mr. Garcia that indicated the phone was registered to Matthew Herip who resided in

14    Sacramento. The phone had last "pinged" in the city of Sacramento.

15          78.      On March 5, 2009, Sergeant Rick Gautier contacted Detective Steve Glen who was assigned to

16    the Sacramento Police Department's (SPD) Career Criminal Apprehension Team (CCAT) and requested that the

17    CCAT assist Detective Min of the Palm Springs Police Department (PSPD) in his efforts to apprehend Mr. Garcia.

18    The primary objective of the CCAT is to help locate and apprehend wanted fugitives. Detective Glen was told that

19    Mr. Garcia was "wanted for a 487 PC [grand theft] and was a possible homicide suspect in an ongoing

20    investigation out of Palm Springs." (Report of Detective Glen, pg. 1, para 1-2.)

21          79.      It is evident that Detective Glen and the CCAT did not have a copy of the arrest warrant for

22    Mr. Garcia. There was nothing to suggest that, prior to their entry and search, the SPD/CCAT knew that the Palm

23    Springs Police Department was looking for any kind of evidence or contraband, nor that SPD/CCAT was supposed

24    to be looking for any kind of evidence. The SPD/CCAT were only supposed to be searching for Daniel Garcia's

25    person—a body.

26          80.      There is no evidence that the SPD/CCAT obtained, or was aware of, any search warrants

27    pertaining to search for Mr. Garcia that authorized the search of any residence or the seizure of any property or

28    evidence.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL      PAGE 15

**XV.    Sacramento Police Detectives Searched for Mr. Garcia**

81.    Sergeant Gautier requested that Detective Glen respond to the residence of Matthew Herip located at 1390 Response Road, Apartment No. 432 in the City of Sacramento to see if Mr. Garcia was inside. The report states that Mr. Herip and Mr. Garcia were "friends." Detective Glen surveilled the house from 18:30 hours until 20:00 hours, at which time he and Sergeant Gautier and Detective Hansen and a K-9 unit approached the house and knocked. Detective Glen reported that, due to the length of time it took Mr. Herip to answer the door, they suspected Mr. Garcia was hiding inside. Mr. Herip informed the detectives that Mr. Garcia was his former boyfriend and they had not been together in several weeks. The detectives searched the apartment, and they did not find Mr. Garcia.

82.    While Searching Mr. Herip's small one-bedroom apartment for Mr. Garcia, detectives found a suspicious amount of brand new property—most still in their original packaging or with price tags still attached—Including a large Sony LED flat screen television, a tanning bed by the front door, copious amounts of designer clothing, and numerous Apple electronic devices including several laptop computers. All of these items had been identified by investigators as having been **purchased with Mr. Lambert's credit cards** after his disappearance—allegedly by Mr. Garcia. The Detectives made no attempts to seize or photograph any of the property or check any serial numbers.

83.    Also inside of Mr. Herip's apartment, Detectives found three fur coats with the name "Cliff Lambert" embroidered inside, several pieces of structured luggage from Louis Vuitton's Monogram Collection, and an ornate Tiffany & Co. clock. All of the aforementioned items were alleged by prosecutors to have gone missing from Mr. Lambert's Palm Springs residence—over 500 miles away—after his mysterious disappearance in early December 2008. There was no sensical reason why Mr. Herip would be in possession of valuable personal property of a man he claims to have never met.

84.    Detectives failed to document in their reports any of the property they found inside Mr. Herip's apartment in plain view.

85.    According to Detective Glen, Mr. Herip told the detectives that Mr. Garcia was living in a loft apartment downtown at 1530 J Street, Unit 310, Sacramento. During the thirty minute conversation, Mr. Herip also "mentioned" that Mr. Garcia had a friend named "Nick Sities" [sic] who lived "somewhere downtown." (Report of Detective Glen, p. 12 of 22, para 5).

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL          PAGE 16

86.    The detectives then went to 1530 J Street and gained entry to the apartment building and spoke with a neighbor of Unit 310 who said he was familiar with Mr. Garcia but had not seen him in about a month. The detectives did not attempt to enter Unit 310 which was Mr. Garcia's listed address with the Department of Motor Vehicles on his California Driver's License.

**XVI.    Mr. Garcia Prepared to Voluntarily Surrender**

87.    On March 7, 2009, Mr. Garcia and his roommate Alexander Shahbazian prepared for a trip to Palm Springs to meet with Mr. Garcia's local criminal defense attorney Mario Rodriguez to arrange for a voluntary surrender. They stayed at the home of Mr. Garcia's friend Nick Seitze as his guest while they made travel arrangements and took care of his dog.

88.    On March 9, 2009, prior to Mr. Garcia's arrest in Sacramento, Mr. Garcia again called attorney Mario Rodriguez and officially hired him to defend him on all charges in this case by telephone agreement. Mr. Garcia spoke to Mr. Rodriguez to confirm the terms of the retainer agreement, and to discuss the case. Mr. Rodriguez again advised Mr. Garcia not to speak with law enforcement. Mr. Rodriguez confirmed that charges had been filed against Mr. Garcia by means of a felony complaint, and that he would be calling the District Attorney to discuss the case. Mr. Rodriguez also told Mr. Garcia that he would be attending Court at the Larson Justice Center for the arraignment of codefendants Replogle and Niroula later that day to talk to the assigned prosecutor.

**XVII.    Mr. Garcia Was Arrested by Sacramento Police Department**

89.    On March 9, 2009, at approximately 12:00 hours, Detectives Glen, Hitchcock and Hansen responded to a location at 623 19th Street, Sacramento, California, which, based on their "further investigation," belonged to Mr. Garcia's friend, Nick Seitze. Detective Hitchcock indicated they had "developed information" that Mr. Garcia might be staying there. (Report of Detective Hitchcock, p. 9 of 22, para 2). It is not clear if the source of this "information" was Mr. Herip's statement that Mr. Garcia had a friend "Nick Sities" [sic] who lived somewhere downtown or if there was additional source of information. The truth and accuracy of these detectives' reports of consent and the manner in which the entry and search were made is disputed.

90.    Mr. Garcia and his friend, Alexander Shahbazian, where staying as guests at Nicholas Seitze's apartment, which occupies the first floor of a large Victorian home located at 623 19th Street in Sacramento. The property is fenced on all sides, with the only entrance being a black iron gate which leads into the yard. The gate

1  has a double cylinder deadbolt, both sides of which require a key and there is no method of unlocking the deadbolt

2  without a key.

3      91.    On or about March 7, 2009, Mr. Seitze left on a business trip to Reno, Nevada and he asked Mr.

4  Shahbazian to watch his apartment and administer medication to his English Bull Dog. Mr. Seitze expected to

5  return from Reno later that week.

6      92.    According to Detective Glen's report, the officers conducted surveillance of 623 19th Street, for

7  approximately an hour and a half "to try to see if Mr. Garcia would enter or leave the premises." Apparently, they

8  did not observe Mr. Garcia, as there was no mention of seeing him in any report. There was no reason given in any

9  of their reports for why they believed Mr. Garcia might be at Mr. Seitze's home at that particular time other than

10  their belief that Mr. Seitze was a "friend" of Mr. Garcia's and so Mr. Garcia "might" be staying there. (Report of

11  Detective Glen, pg. 13, para. 2.)

12      93.    On Monday, March 9, 2009, at approximately 13:15 hours there was an unexpected knock on the

13  front door. Mr. Shahbazian and Mr. Newcomb answered the door and there was a man (later identified as a law

14  enforcement officer) holding a photocopied "reward if found"/"lost dog" flyer, depicting a St. Bernard. As they

15  spoke to the man, Mr. Shahbazian walked into the front yard and smoked a cigarette. The man stated that he had

16  lost his dog in the neighborhood and that "some lady" thought she had seen the dog in the apartment's yard. Mr.

17  Shahbazian said that he had not seen any St. Bernard. The gentleman asked their names and Mr. Shahbazian stated,

18  "my name is Alex." The man thanked them for their time and Mr. Shahbazian shook his hand.

19      94.    The man then went upstairs to the apartment on the second floor and spoke briefly to the women

20  that lived up there. The upstairs neighbor stated that no St. Bernard had been seen in the area. Mr. Shahbazian

21  walked with the man to the front gate and locked the gate behind the man as he left. No mention of this encounter

22  appears in any of the police reports provided in discovery.

23      95.    After securing the front gate, Mr. Shahbazian re-entered the residence and told Mr. Garcia about

24  the encounter. Having extensive experience in assisting law enforcement, Mr. Garcia quickly recognized the

25  encounter as a possible police tactic and suspected that the man was a police officer who would likely return.

26      96.    A few minutes later, there was a loud and persistent knock on the door which was disconcerting

27  as Mr. Shahbazian had just locked the front gate minutes earlier which was the only point of legal entry onto the

28  property. Mr. Shahbazian quickly ushered Mr. Garcia to a hall closet and Mr. Garcia proceeded to call his attorney

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL        PAGE 18

1   Mario Rodriguez. When Mr. Shahbazian opened the front door, the officers pushed their way in without asking

2   permission, and without invitation. Detectives Glen, Hitchcock and Hansen were in plain clothes and wearing

3   tactical vests that said "police" on the back. They stated that they were involved with an investigation and asked if

4   Mr. Shahbazian and Mr. Newcomb if they had identification, which they both provided. They asked for permission

5   to search which was repeatedly denied by Mr. Shahbazian. One of the officers was actively looking around the

6   apartment. Mr. Shahbazian ushered the officers outside and repeatedly asked them to leave. The officers asked if

7   either of the occupants had any outstanding warrants and Mr. Shahbazian stated that he did not. They continued to

8   question the men separately.

9       97.    Detective Hitchcock asked who lived there and whether there was anyone else inside. Both men

10  denied anyone else was there. Mr. Shahbazian told Detective Hitchcock he had been house-sitting for the past few

11  days while Mr. Seitze was in Reno on business. (Report of Detective Hitchcock, p. 9 of 22 para 4). Mr. Newcomb

12  said he had just moved in and was paying rent to Mr. Seitze for the "back [northeast] bedroom." Detective Glen

13  reports he asked if they could search "to make sure no one was inside of the house" which he characterized in his

14  report as a "protective sweep" and Mr. Shahbazian said no, because the owner was not at home. (Report of

15  Detective Glen, p. 13 of 22, para 3).

16      98.    Detective Hitchcock asked Mr. Shahbazian and Mr. Newcomb for Mr. Seitze's cell phone

17  number and they both said they did not know it or how to reach him. Detective Hitchcock ordered Mr. Newcomb

18  and Mr. Shahbazian to search their phones for Mr. Seitze's cell phone number. Mr. Shahbazian reportedly

19  complied but gave him the number with two digits reversed, so the detectives were unable to reach Mr. Seitze.

20      99.    Detective Glen then asked if either of the men were on probation or parole. Detective Glen

21  reported that Mr. Newcomb said he was on informal probation for possession of brass knuckles. Detective Glen

22  reported that he searched but was unable to locate Mr. Newcomb's or Mr. Shahbazian's names in the system by

23  portable radio. Mr. Shahbazian supposedly remained in the living room with Detectives Glen and Hitchcock who

24  reported that Mr. Shahbazian continued to tell them there was no one else there and they did not have permission to

25  search. (Report of Detective Glen, p. 13 of 22, para 4-5).

26      100.   Detective Hansen reported that Mr. Newcomb gave him permission to search his bedroom and

27  the common areas. Mr. Newcomb supposedly "led" Detective Hansen to the kitchen, the northeast bedroom, and

28  the bathroom. Mr. Garcia was not in any of those rooms. Detective Hansen reported that when he walked toward

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL          PAGE 19

1    what Detective Glen described as a 3'x4' water heater closet, in the hallway, Mr. Shahbazian blocked his entry and

2    told him again he did not have a right to search the house. (Report of Detective Hansen, p. 5 of 22, para 2).

3         101.    Detective Hitchcock told Mr. Shahbazian "that we were only looking for a body and that we

4    weren't going to be searching through any drawers or anything. (It is asserted that the officers ultimately searched

5    the entire house, including closed drawers and cabinets.) "At that point, he hadn't asked me who we were looking

6    for and we hadn't told him. Mr. Shahbazian told me he was in charge while Mr. Seitze was in Reno and he insisted

7    we weren't permitted to search any rooms of the house." Detective Hitchcock stated that Mr. Shahbazian

8    "remained adamantly opposed" to them searching the rest of the house. (Report of Detective Hitchcock, p. 9 of 22,

9    para 4, p. 10 of 22, para 2).

10        102.    Detective Hansen said he and Mr. Newcomb returned to the living room, at which point

11    Detective Hitchcock took Mr. Newcomb outside so he could question him away from Mr. Shahbazian. Mr.

12    Newcomb then gave him Mr. Seitze's phone number. Detective Hitchcock then showed him a photo of Mr. Garcia

13    and asked if he knew him. Mr. Newcomb said yes he was a friend of Mr. Seitze but said he had not seen him for a

14    couple of months and had never seen him at this residence. About that time Detective Hitchcock heard shouting

15    from inside the house, looked in and saw Detective Hansen handcuffing Mr. Shahbazian.

16        103.    Detective Glen had told Mr. Shahbazian that Mr. Newcomb was on probation and that gave him

17    the right to search the residence even though he had no evidence of a search clause. (Report of Detective Glen, p. 13

18    of 22, para 6). He told Mr. Shahbazian that if in fact he found someone hiding in the house Mr. Shahbazian would

19    go to jail. At that point, Detective Glen reported that he walked past Mr. Shahbazian and opened the closet door,

20    apparently revealing Mr. Garcia inside. Mr. Garcia reportedly had a "throwaway" cell phone in his possession when

21    he was located.[2] Detective Glen pulled Mr. Garcia out of the hallway and handcuffed him on the living room floor

22    without incident or resistance. Mr. Garcia was then sat on an ottoman in the living room by the front door. The

23    detectives then conducted a "protective sweep" of the entire residence.

24        104.    Mr. Garcia asked to know the cause of his arrest or to see a copy of the arrest warrant. He was

25

26    _____

27

28    [2] It is not clear why detectives referred to Mr. Garcia's cellular phone as a "throwaway" as it was a regular Nokia cellular phone with service through AT&T Wireless. At no time did Mr. Garcia attempt to throw away or discard his cellular phone.

1  told to "shut up." Mr. Garcia stated he wanted to speak to his attorney.

2      105.    After he arrested Mr. Garcia, Detective Glen had Officer Hoverston re-run the search for

3  Mr. Newcomb's probation records from his car. The search revealed that Mr. Newcomb had been arrested for PC

4  §12020 but there was no search clause attributed to his arrest as had been falsely told Mr. Shahbazian, which he

5  claimed gave him authority to conduct a warrantless search of the entire residence. (Report of Detective Glen, p. 14

6  of 22, para 2).

7  **XVIII.   Detectives Proceeded to Conduct a Warrantless Search of the Entire Residence**

8      106.    Despite having achieved their sole objective of arresting Mr. Garcia, the detectives, nevertheless,

9  proceeded to conduct an extensive warrantless search of the entire home and its contents.

10      107.    Detectives returned to question Mr. Garcia about the ownership and contents of several pieces of

11  luggage found in the master bedroom. The detectives failed to administer *Miranda* advisements, but Mr. Garcia

12  nonetheless invoked his right to remain silent and his right to counsel. Detectives proceeded to attempt to interview

13  Mr. Garcia anyway and threatened to damage Mr. Garcia's valuable property if he did not speak to them. During

14  the interrogation, Mr. Garcia identified which items belonged to him and did not give his consent for detectives to

15  search any of his property. Mr. Garcia's short responses to the detectives' questions were used by the Riverside

16  County District Attorney to justify a warrantless search and seizure of voluminous personal property that was

17  derivative evidence of the unlawfully obtained statement.

18      108.    The officers then proceeded to search through the luggage in the west [master] bedroom anyway.

19  Detective Hansen located several laptop computers supposedly in plain view and indicia of Mr. Garcia **inside**

20  several black duffle style bags that he found in the master bedroom. Whether the computers were in plain view or

21  inside the closed luggage is disputed. It is asserted that the officers removed the laptops from the luggage and turned

22  one on and examined it **at the scene**.[3] Detective Hansen also located an Apple iPhone inside of one of the black

23  Louis Vuitton bags. (See Seized Property Report, pg. 20-22 indicating that the iPhone was taken out of item #11

24  which is described as "black Louis Vuitton handbag").

25

26  _____

27

28      [3] A forensic examination proved that one of the Apple MacBook Pro laptop computers was in fact turned on after Mr. Garcia's arrest and connected to the internet, thereby demonstrating that Detective Hansen conducted a warrantless search of the contents of the laptop computer prior to its seizure.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL          PAGE 21

109.    According to Detective Glen's report, he then contacted Detective Min of PSPD and advised him they had located several Apple laptops and other computer-related items. (Report of Detective Glen, p. 14 of 22, para 4). At that time Detective Min told him there was a white Apple laptop missing which belonged to his victim Clifford Lambert. Mr. Garcia had already been arrested. Detective Min then asked if Detective Glen could write a search warrant. Detective Glen informed Sergeant Gautier, who had already left the scene of Detective Min's request. Sergeant Gautier told Detective Glen to seize whatever items he thought might have evidentiary value for the PSPD and the PSPD could get their own warrant at a later time to search the items post-seizure. Detective Glen then told Detective Hansen that they needed to seize all of the items for the PSPD **(even though they had no search warrant)**.

110.    Detective Glen reported that he asked Mr. Shahbazian if he could search some bags that had Mr. Shahbazian's name on them. Mr. Shahbazian said no. (Report of Detective Glen. p. 14 of 22. para 6). Then Detective Glen reported that he told Mr. Shahbazian he would not take them if they did not have anything in them that he should not have. Mr. Shahbazian then allegedly gave consent but no computers and no items belonging to Mr. Garcia were found inside. Nevertheless, Detective Glen arrested Mr. Shahbazian and seized all of the bags in the master bedroom and a blue bag from the living room after Mr. Shahbazian declined to give a statement and asked for a lawyer. Mr. Shahbazian was later released on March 10, 2009, and no charges were filed against him.

111.    After Mr. Garcia and Mr. Shahbazian were arrested and the house "cleared" by "protective sweep", Detective Hitchcock obtained a "more detailed statement" from Mr. Newcomb. Mr. Seitze had given him a key and he moved in before Mr. Seitze went to Reno on Saturday (March 7). Messrs. Garcia and Shahbazian were already staying there. Mr. Newcomb's bedroom is in the back of the house. Mr. Garcia and Mr. Shahbazian were staying in Mr. Seitze's master bedroom at the front of the house. The middle room is a guest room.

112.    After Mr. Garcia was arrested, Detective Hitchcock called Mr. Seitze, who confirmed that Messrs. Garcia and Shahbazian were guests in his home. (Report of Detective Hitchcock, p. 10-11 of 22). Mr. Seitze further stated that Mr. Garcia is his friend and had slept on the couch one evening and let Messrs. Garcia and Shahbazian use the master bedroom before he left for Reno. After that, Messrs. Garcia and Shahbazian continued to stay in the master bedroom. Mr. Seitze had slept on the couch to let them use the master bedroom before he went to Reno. Mr. Seitze at no time indicated that he wished to have Messrs. Garcia and Shahbazian removed from his residence, nor did he consent to the seizure of their property.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL          PAGE 22

113.    Mr. Seitze told Detective Hitchcock that the only luggage that he owned was with him in Reno. All the other luggage, the black bags and the computers belonged to Messrs. Garcia and Shahbazian. (Report of Detective Hitchcock, p. 11 of 22) Mr. Newcomb also informed Detective Hansen that none of the luggage or computers were his. Although Detective Hansen originally reported that Mr. Garcia told him none of the bags were his, he later said Mr. Garcia told him that the Louis Vuitton bags were all his. Mr. Shahbazian said that some of the black bags and two of the computers were his and the remaining bags and computer belonged to Mr. Garcia. (Report of Detective Hansen, p. 4-5 of 22).

114.    Detective Hansen wrote: "We knew the bags and computers did not belong to the residents so we collected them for safekeeping. We believed the bags and computers belonged to both Garcia and Shahbazian so they were also collected as personal items collected incident to arrest." (Report of Detective Hansen, p. 5 of 22) Detective Hansen said they had "prior" knowledge that Mr. Garcia might be in possession of an Apple computer and/or accessories so they recognized the Apple laptop computers and computer accessories as possibly being contraband. Officers seized voluminous pieces of luggage containing dozens of electronic devices, without a search warrant or probable cause. They stated that Palm Springs Police could obtain their own search warrant after-the-fact. All of the property was booked into the Sacramento Police Department Evidence Locker. No receipt for the property was left. Mr. Shahbazian later attempted to collect his belongings and was not permitted to per the District Attorney's instructions. All of the booked items were listed as property of Daniel Garcia, according to Ofc. Kimoto. (Report of Ofc. Kimoto)

115.    At no time was an arrest warrant or search warrant mentioned or displayed at the residence prior to the unwarranted search and seizure.

XIX.    **Sacramento Police Department Released Mr. Garcia's Unlawfully Seized Property to Palm Springs Police**

116.    On March 12, 2009, Detective Min obtained search warrant PSSW0004 **post-seizure** from the Honorable James A. Cox requesting a search warrant for the voluminous property **already seized** from Mr. Garcia by the SPD detectives **without a warrant**. Detective Min in his affidavit in support of the issuance of the search warrant, made materially false statements deceiving the magistrate. Detective Min falsely claimed that the SPD detectives could not determine the ownership of the seized property. By all accounts, the SPD detectives had in fact determined ownership of the property and Mr. Garcia specifically objected to the search and seizure of his property. At all times, Mr. Garcia asserted his right to privacy as to his personal property.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL        PAGE 23

1    117.    On March 17, 2009, Detective Steve Hansen authorized the property unlawfully seized from Mr.

2  Mr. Garcia to be released to the Palm Springs Police Department by sending the following command to Officer

3  Poirier by stating, "I have concluded the investigation documented on the above-referenced GO number. I authorize

4  the disposal of all associated property/evidence as follows: . . .". He authorized all property to be released to Palm

5  Springs Police Department Detective Browning. At no time did Detective Hansen attempt to verify if Detective

6  Browning had legal authority to take possession of Mr. Garcia's property or request to review the search warrant.

7    118.    On or about March 17, 2009, Sacramento Police Department property room Officer A.

8  Richardson released all of Mr. Garcia's personal property to Palm Springs Police Department Detective Browning.

9  **XX.    Mr. Garcia Was Booked Into Sacramento County Jail**

10    119.    Mr. Garcia was taken to the Sacramento County Jail and booked into custody.  He again asked to

11  see a copy of the arrest warrant but was told one was not available as it was issued from a different county.

12  Detective Glen again attempted to question Mr. Garcia about the case, but Mr. Garcia stated he wanted to call his

13  attorney. Mr. Garcia's requests to call his attorney were denied.

14    120.    Mr. Garcia was booked into the Sacramento County jail and moved repeatedly to different cells

15  over the course of four days and to a separate facility in Elk Grove. This made it impossible for his attorneys to

16  locate and visit Mr. Garcia.

17    121.    Mr. Garcia requested medical attention as he started to suffer from withdrawal symptoms from

18  his prescription medications as a result of the jail not providing him with his prescription medications. The jail

19  refused to provide Mr. Garcia with his antidepressant and antianxiety medications that had been prescribed by his

20  psychiatrist. Mr. Garcia was extremely sleep deprived and began to suffer panic attacks and symptoms of

21  withdrawals from his prescription medications.

22    122.    Mr. Garcia's mother called the Sacramento County Jail several times to attempt to have them

23  provide Mr. Garcia with his prescription medications but was told that the jail would not provide them.

24    123.    Mr. Garcia was not arraigned within 48 hours or taken before a local magistrate for arraignment.

25  Mr. Garcia was not allowed to post bail. Mr. Garcia was not advised of these rights as required by Penal Code §821.

26    124.    Mr. Garcia was not permitted to call his attorneys or have them contacted on his behalf.

27  **XXI.    Mr. Garcia Was Transferred to The Riverside County Jail In The Middle of The Night**

28    125.    Mr. Garcia was placed on a bus in the middle of the night and transported to Riverside without

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL          PAGE 24

notice.

126.    Palm Springs Police Detective Browning testified that when he learned of Mr. Garcia's arrest in Sacramento, he asked to be notified when Mr. Garcia was transported to Riverside lockup so he could interview Mr. Garcia:

> A. [By Detective Browning] Well, when I learned of his arrest in Sacramento and then the Riverside County Sheriffs were going to pick him up from Northern California and transport him to Southern California, I asked that I be notified when they got into town so I could interview him, and as he was -- I believe they called me when he was an hour out away from the Robert Presley Detention Center in Riverside. I was notified that they were going to be there within the hour.
> (Reporter's Transcripts of Suppression Motion in Trial Court Proceedings)

127.    Mr. Garcia arrived at the Robert Presley Detention Center in downtown Riverside on the morning of March 13, 2009—a Friday. Although court was in session, Mr. Garcia was not taken before a magistrate for arraignment as required. He was placed barefoot into a cold holding cell and not provided medical attention. The jail's medical staff refused to provide Mr. Garcia with his antidepressant and antianxiety medications. Mr. Garcia was extremely sleep deprived and still suffering from symptoms of withdrawals from his prescription medications.

128.    Detective Browning drove to the jail, where he was told Mr. Garcia was in a holding tank. Detective Browning was alone. He concealed his digital recorder in an office across from the holding tank. He turned on the recorder, then asked deputies to bring Mr. Garcia without restraints to the office.

129.    A Hispanic Senior Deputy told Mr. Garcia that someone was there to speak with him. Mr. Garcia asked to call his attorney, but his requests were denied. The Senior Deputy assured Mr. Garcia that it was just an "informal interview" and "off the record" and that Mr. Garcia could go home afterwards.

**XXII.    Detective Browning Conducted a Two-Hour Interview of Mr. Garcia Without Counsel Present**

130.    Mr. Garcia was taken across the hall to an office. Detective Browning was in civilian clothes. There were no visible audio or video recording devices, and he was not told the conversation would be recorded.

131.    Detective Browning stood in the office door and asked Mr. Garcia how he was doing while Mr. Garcia remained outside of the office. Detective Browning stated, "How are you doing Danny? Detective Browning. Let me—want to come in here? I'm here to discuss about what's going on man. I'm sure you have a lot of questions."

132.    Detective Browning then proceeded to give the following partial *Miranda* advisement, leaving out the part where a suspect is asked whether or not he wished to waive his *Miranda* rights:

> BROWNING:    Here, have a seat. Off the bat, I'm going to tell you, you have the right to remain silent.

Anything you say may be used against you in court. You have the right to the presence of an attorney before and during any questioning. If you cannot afford an attorney, one will be appointed for you free of charge before any questioning if you wish, if you want. Do you understand that?
GARCIA:        Yes, I do.

133.    Detective Browning's tone was kind of matter-of-fact, and he was talking to another officer at the door with his back turned towards Mr. Garcia.

134.    Mr. Garcia was confused because although he understood his rights and had already exercised them repeatedly when he asked for his lawyer at the time of his arrest, repeatedly at the Sacramento Jail, and again just minutes before to the Riverside County Senior Deputy, clearly, he was not being provided his attorney. Detective Browning did not ask if Mr. Garcia waived his rights.

135.    Detective Browning was fully aware that Mr. Garcia was represented by retained counsel and that formal charges had been filed against Mr. Garcia prior to the interview.

136.    At the time of the police-initiated custodial interrogation, the United States Supreme Court's decision in *Michigan v. Jackson* was still controlling legal precedent which should have been known to a seasoned detective such as Detective Browning. (*Michigan v. Jackson* (1986) 475 U.S. 625, 632.) Under the holding in *Jackson*, once a defendant's Sixth Amendment right to counsel attaches, police were strictly inhibited from questioning a defendant and any waiver of a right to counsel in response to an otherwise valid *Miranda* warning is automatically considered as involuntary, and thus invalid.

137.    Detective Browning acknowledged that Mr. Garcia was already charged with fraud against Clifford Lambert, as well as using Mr. Lambert's ATM debit card without his permission and told Mr. Garcia he wanted to talk about those charges.

138.    A few minutes after the interrogation began, Mr. Garcia, after already informing Detective Browning that he had retained an attorney over the phone on March 6th, again reminded Detective Browning that he had retained counsel:

BROWNING:    Okay.    Um, how many times have you gone to his [Lambert's] house within that year?
GARCIA:        Probably -- I was trying to figure this out because **I was going to send it to my lawyer**—probably around like eight or nine times.
[emphasis added]

139.    During the interview Detective Browning promised Mr. Garcia that he would be "golden" and become a witness for the prosecution. Detective Browning promised leniency and said Mr. Garcia would receive a "slap on the wrist" and probably probation.

1      140.    Detective Browning obtained a lengthy statement from Mr. Garcia that implicated him in various

2    financial crimes against Mr. Lambert, but not murder.

3      141.    Mr. Garcia was not released as promised, nor was he arraigned or allowed to post bail.  He was

4    still not permitted to contact his attorney.

5      142.    On March 19, 2009, six days after Mr. Garcia's March 13, 2009, interview with Detective

6    Browning, Palm Springs Detectives Min and Browning requested the Riverside County District Attorney's Office

7    charge Mr. Garcia with the murder of Clifford Lambert.

8      143.    Mr. Garcia had been held incommunicado for four days without being brought before a local

9    magistrate or arraigned within 48 hours as required by law, thereby converting his otherwise lawful arrest into an

10    unlawful detention. It was during this intentional and unconstitutional delay in arraignment that Palm Springs

11    Police Detective Browning initiated another custodial interrogation of Mr. Garcia despite Detective Browning's

12    knowledge that Mr. Garcia was represented by counsel, and that he had repeatedly invoked his right to counsel

13    with Sacramento Police Detectives. The resulting unlawfully obtained statement was used to form the basis of

14    additional charges, including murder and criminal conspiracy, that were later filed against Mr. Garcia. The

15    statement was introduced against Mr. Garcia at the first trial as the primary evidence to establish guilt on all the

16    charges.

17    **XXIII.  Mr. Garcia Was Finally Arraigned Seven Days After His Arrest**

18      144.    On March 16, 2009, Mr. Garcia was finally arraigned on the felony complaint, seven days after

19    his arrest.  No explanation was provided for the delay, and court had been in session every day of the previous

20    week, including the day that Detective Browning interrogated Mr. Garcia.

21      145.    Mr. Garcia was finally able to contact his attorney Mario Rodriguez who formally appeared in

22    the case on March 19, 2009.

23      146.    Mr. Rodriguez was outraged to hear that Mr. Garcia had been interviewed by Detective Browning

24    despite Mr. Garcia being represented by counsel. Mr. Rodriguez told Mr. Garcia that he had called the jail and

25    District Attorney's Office to tell them Mr. Garcia was represented by counsel.

26      147.    Mr. Rodriguez told Mr. Garcia that he would move to suppress the statement at the preliminary

27    hearing on the basis it had been obtained in violation of Mr. Garcia's Sixth Amendment right to the assistance of

28    counsel.

**XXIV.  Mr. Garcia Repeatedly Moved to Suppress His Statement**

148.    Mr. Garcia repeatedly moved to suppress the unlawfully obtained statements and derivative evidence; however, the first trial court erred in its application of United States Supreme Court precedent and failed to suppress the statements. The prosecution could not have met their evidentiary burden without the use of Mr. Garcia's statements and derivative evidence and a different result would have been likely.

149.    Mr. Garcia filed a motion to suppress evidence, including his statement pursuant to Penal Code §1538.5; however, the first trial court denied the motion.

150.    On June 21, 2012, Mr. Garcia again moved to have his statement to Detective Browning excluded. Mr. Garcia argued at the hearing that his statement was obtained in violation of the United States Supreme Court decisions in *Edwards v. Arizona* (1981) 451 U.S. 477 and *Minnick v. Mississippi* (1990) 498 U.S. 146.

151.    Detective Browning testified at the hearing on Mr. Garcia's motion to exclude his statement. Detective Browning testified that during the March 6, 2009 recorded conversation, Mr. Garcia informed him that he had counsel.

152.    Detective Browning testified that a warrant had been issued for Mr. Garcia's arrest and that Mr. Garcia had been charged with felony financial crimes, prior to Mr. Garcia's arrest and subsequent interview.

153.    Detective Browning testified that he initiated the in-custody March 13, 2009, interview of Mr. Garcia.

154.    The Court found, and the prosecution conceded, that Mr. Garcia had counsel prior to Detective Browning initiating the interview:

THE COURT:    You need to concede, too, at some point, [Garcia] had talked to a lawyer?
DiMARIA:       I'm sorry?
THE COURT:    We need to concede that he did.
DiMARIA:       I have no problem with that. What I won't concede --
THE COURT:    He was going to have a lawyer show up and surrender him or whatever.
DiMARIA:       And according to Patterson versus Illinois, it is irrelevant, though. That is the point.
               Unless he asks, during questioning, that he wants that lawyer present . . . .
(Reporter's Transcripts of Suppression Motion in Trial Court Proceedings)

155.    Prosecutor DDA Lisa DiMaria was referring to *Patterson v. Illinois* (1988) 487 U.S. 285, where the defendant **never invoked** his right to counsel, then later a deputy initiated a post-indictment interview. *Patterson* waived his right to counsel after being *Mirandized*, and the court found the statement was voluntarily made. (*Patterson* 487 U.S. at 288-291).

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL        PAGE 28

156.     The Court denied Mr. Garcia's motion to exclude his statement to Detective Browning, finding that the partial *Miranda* advisement was sufficient. The Court failed to consider the US Supreme Court cases cited by Mr. Garcia. In addition, the trial court failed to rule on the delay in arraignment claim that Mr. Garcia raised.

| | |
|---|---|
| DEFENDANT GARCIA: | Your Honor, can I just, for the record, there was another issues that I had addressed regarding – actually there are several issues I addressed. One was Penal Code section I believe 821 and 825, delay in arraignment. |
| THE COURT: | I know, but that is what it is. You were arrested in another county and brought back here. |
| DEFENDANT GARCIA: | But I was not brought before a local magistrate within 48 hours, as required by statute I cited -- |
| THE COURT: | I know that. That is agreed. The problem is, is that you have no remedy. |

(Reporter's Transcripts of Suppression Motion in Trial Court Proceedings)

| | |
|---|---|
| DEFENDANT GARCIA: | Actually I was citing People versus Pettingill, P-e-t-t-i-n-g-i-l-l, 1978, 21 Cal.3d 231, where it says "an unreasonable delay between an arrest and arraignment converts a lawful arrest into an unlawful detention and a confession obtained as a result of a[n un]lawful detention may be subject to suppression." |

(Reporter's Transcripts of Suppression Motion in Trial Court Proceedings)

157.     A second hearing on excluding Mr. Garcia's statement was held on July 6, 2012, but the trial court made no ruling on Mr. Garcia's second motion to exclude. Instead, the judge held he did not "like making decisions out of my back pocket. I don't like shooting from the hip. . . . We shouldn't be shooting from the hip. I don't like it." (Reporter's Transcript.)

158.     On August 26, 2020, Judge Anthony R. Villalobos finally ordered Mr. Garcia's statement to Detective Browning suppressed on the basis it was obtained in violation of Mr. Garcia's Sixth Amendment right to counsel.

**XXV.     The 2012 Trial and Conviction of Daniel Garcia**

159.     During Mr. Garcia's 2012 criminal trial, the prosecution relied almost exclusively on false evidence that had been obtained from the property unlawfully seized without a warrant by Detectives of the Sacramento Police Department following Mr. Garcia's arrest. The prosecutor argued that text messages downloaded from an Apple iPhone found within Mr. Garcia's property demonstrated that he was part of a criminal conspiracy. In reality, there was no evidence that the text messages had ever actually been sent or received, and the alleged text messages were in fact all uploaded *en masse* onto the iPhone months later in an intentional effort to falsely implicate Mr. Garcia in criminal conduct.

160.     The prosecution further alleged that an Apple MacBook Pro laptop computer seized by Sacramento Police belonged to Mr. Garcia. That computer had been identified by investigators as having been

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL          PAGE 29

purchased with one of Mr. Lambert's credit cards after his mysterious disappearance and thus appeared to link Mr. Garcia to a potential fraud against Mr. Lambert. This was unfortunately due to the fact that all of the property seized was booked by Detectives into evidence at the Sacramento Police Department under the name of Mr. Garcia only. At that time, it had not been disclosed that Mr. Shahbazian—not Mr. Garcia—had claimed ownership of that laptop computer and had called the Sacramento Police Department seeking its release. Such evidence would have exonerated Mr. Garcia had it been presented to the jury and a different outcome would have been likely. No witnesses testified that Mr. Garcia was involved in any criminal conduct and no credible evidence was introduced inculpating Mr. Garcia into the disappearance or alleged murder of Mr. Lambert—his friend. The prosecution's entire case against Mr. Garcia rests solely on the unlawfully obtained evidence seized by Sacramento Police.

161.    On September 7, 2012, Daniel Carlos Garcia, was convicted by a jury of, *inter alia*, first degree murder, with a special circumstance that the murder was carried out for financial gain (count 1), and conspiracy to commit murder and various theft based crimes (count 2). It was uncontested that Mr. Garcia was not the actual killer, was not present for the alleged murder, nor had he ever communicated with the actual killers. Mr. Garcia's guilt was based on the prosecution's theory of vicarious culpability as an accomplice and imputed malice under the now legally invalid natural and probable consequences doctrine.

162.    On October 5, 2012, Mr. Garcia was sentenced to life without the possibility of parole plus six years. His conviction was affirmed on appeal, with the Court of Appeal finding that the violation of Mr. Garcia's Sixth Amendment right to confrontation was harmless error in light of circumstantial evidence to support that Mr. Garcia conspired with people he had never met or communicated with to murder the victim Mr. Lambert. Throughout their opinion, the Court of Appeal referenced the unlawfully seized evidence **exclusively** as the basis for their decision.

**XXVI.    The 2020 Reversal of Mr. Garcia's Wrongful Conviction**

163.    On June 8, 2020, Judge David A. Gunn of the Superior Court of Riverside County granted Mr. Garcia's *unopposed* petition for a writ of habeas corpus and vacated his criminal conviction in its entirety. Unfortunately, it had taken over seven and a half years from the wrongful conviction to correct this miscarriage of justice.

**STATEMENT OF DAMAGES**

164.    Defendants' actions deprived Plaintiff Daniel Carlos Garcia of his civil rights as guaranteed under the United States Constitution and laws enacted by Congress, and the Constitution and laws of the State of California.

165.    This action seeks damages for the period from March 9, 2009 through each and every year to the present. Mr. Garcia's liberty was curtailed upon his arrest on March 9, 2009. He remains incarcerated and in the custody of Riverside County Sheriff's Department and is currently housed at the Southwest Detention Center. The damages suffered by Mr. Garcia began in 2009 and continue unabated to the present and for the foreseeable future.

166.    Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions caused Mr. Garcia to be subjected to unlawful police interrogation, to have to his personal property unlawfully seized from a private residence without a warrant, to remain in custody without bail or arraignment converting his otherwise lawful arrest into an unlawful detention, and to be denied the assistance of counsel—all of which had a direct and proximate result of Mr. Garcia being charged with additional offenses maliciously prosecuted, tried, wrongfully convicted, and incarcerate for over eleven and a half years for crimes he did not commit.

167.    Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions caused Mr. Garcia the following injuries and damages, which continue to date and will continue into the future: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of family relationships and close friendships; severe psychological damage; damage to business and property; legal expenses; loss of income; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled monetary relief.

168.    As a result of his wrongful incarceration, Mr. Garcia missed the opportunity to spend time with his aging parents when he was arrested and prevented him from seeking companionship and marriage and the ability to start a family and have children. Mr. Garcia's parents are now 76 years old and 57 years old respectively and he has missed spending time with them over the last eleven and a half years. Mr. Garcia has also missed

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL          PAGE 31

1  spending time with his extended family members including his grandmother who is 83 years old, family matriarch

2  and great-aunt who is 100 years old, seven siblings, the birth of his first niece, and was unable to attend funeral

3  services for the death of numerous relatives. Mr. Garcia has not been able to see or visit with his fiancée in over

4  two years.

5        169.    Mr. Garcia has suffered substantial financial losses resulting from loss of investments and

6  appreciated value, and over $350,000 in debt now to Mr. Garcia's parents—plus interest—for his legal expenses

7  and costs while in custody. Additionally, Mr. Garcia suffered the loss of over $200,000 in personal property.

8        170.    As a direct and proximate result of the Defendants' unlawful seizure, retention, and conversion of

9  Mr. Garcia's personal property—including computer equipment and electronically stored information—he has

10  suffered the loss of the busines value of his software application and technology, *The Hydra Project*. By Defendants

11  denying Mr. Garcia access to the source-code and schematics for his proprietary technology, thus prevented him

12  from pursuing lucrative contracts potentially worth tens of millions of dollars. The financial damages are in excess

13  of $100,000,000 (one-hundred million dollars).

14        171.    Damage to Mr. Garcia's health, lack of medical treatment for his medical conditions, poor dental

15  health, mental anguish, and loss of hair all resulting directly from his illegal incarceration.

16        172.    These injuries and damages to Mr. Garcia were foreseeable to Defendants at the time of their acts

17  and omissions.

18        173.    Pursuant to California Government Code §825(a), Defendants are entitled to indemnification

19  because their individual liability and acts of misconduct arose from acts and omissions within the course and scope

20  of their employment with the County of Riverside and the State of California. California Tort Claims Act (liability

21  of an employee working for a public entity for dangerous conditions) California Government Code, Article 4, §825

22  which provides indemnification of public employees to defend him or her against any claim or action against him

23  or her for an injury arising out of an act or omission occurring within the scope of his or her employment as an

24  employee of the public entity.

25        174.    All of the acts and omissions committed by Defendants were done intentionally, unlawfully,

26  maliciously, wantonly, recklessly, negligently and/or with bad faith, and said acts meet all of the standards for

27  imposition of punitive damages.

28

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL          PAGE 32

**FIRST CAUSE OF ACTION**
**42 U.S.C. §1983 (Civil Rights Act)**
**Claim for Denial of Right to counsel During Police Interrogation in Violation of the Fifth and Sixth**
**Amendments to the United States Constitution**

175.     Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

176.     The Sixth Amendment provides that "In all criminal prosecutions, the accused shall enjoy the right. . .to have the Assistance of Counsel for his defense." (*U.S. Const. amend. VI.*) The Sixth Amendment applies to state criminal prosecutions through the Fourteenth Amendment. (*Gideon v. Wainwright* (1963) 372 U.S. 335, 342.)

177.     The Sixth Amendment right to counsel attaches at initiation of judicial criminal proceedings. (*Kirby v. Illinois* (1972) 426 U.S. 682, 689-90.) The filing of a complaint by a prosecutor in California triggers the Sixth Amendment right to counsel. (*People v. Viray* (2005) 134 Cal.App.4th 1186, 1205.)  Once the right attaches, a criminal defendant is entitled to the assistance of counsel at all critical stages in the proceedings—including during police interrogations.

178.     When an accused is represented by counsel and has been formally charged with a crime, police questioning on that case without giving defense counsel the opportunity to speak to the defendant and to be present during questioning and without a valid waiver by counsel, violates the Sixth Amendment. (*Minnick v. Mississippi* (1990) 498 U.S. 145; see also, *Fellers v. United States* (2004) 540 U.S. 519, 524-25 (Sixth Amendment violation when defendant made incriminating statements during voluntary discussion at home because discussion took place after formal charges and without informed waiver of right to counsel.).)

179.     In addition to the Sixth Amendment right to the assistance of counsel during police questioning, the Fifth Amendment provides in pertinent part that "[n]o person. . .shall be compelled in any criminal case to be a witness against himself." (*U.S. Const. amend V.*) The privilege against self-incrimination applies to the states through the Fourteenth Amendment. (*Maryland v. Shatzer* (2000) 559 U.S. 98, 103.)

180.     In *Miranda v. Arizona*, the Supreme Court held that custodial interrogations have the potential to undermine the Fifth Amendment privilege against self-incrimination by possibly exposing a suspect to physical or psychological coercion. (*Miranda v. Arizona* (1966) 384 U.S. 436, 446-50, 467.) To guard against such coercion, the Court established prophylactic procedural mechanism that requires a suspect to receive a warning before

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL          PAGE 33

1  custodial interrogation begins. (*Id.* at 444.)  Unless suspects are warned of their Fifth Amendment rights, any

2  statements elicited from them are unlawful and inadmissible.

3        181.  On March 2, 2009, a felony complaint was filed in the Superior Court for the County of

4  Riverside, in case no. INF064492, charging Mr. Garcia with felony grand theft and identity theft. The filing of a

5  felony complaint triggered the Sixth Amendment right to counsel, which Mr. Garcia exercised by retaining private

6  attorneys to represent him in that matter.

7        182.  Both Mr. Garcia and his attorneys notified law enforcement that he was represented and desired

8  to interface with the government through counsel. This prohibited any attempts by law enforcement to question Mr.

9  Garcia absent his attorneys' knowledge, presence, and consent.

10        183.  On March 9, 2009, immediately following Mr. Garcia's arrest, he was sat on an ottoman in

11  handcuffs while Sacramento Police Detectives Hansen, Glen, and Hitchcock proceeded to interrogate him **despite**

12  **no *Miranda* advisements and without the knowledge, presence, or consent of Mr. Garcia's attorneys**. The

13  detectives' questions pertained to ownership of property they believed to be possible evidence pertaining to the

14  charged offenses. Mr. Garcia's responses to the detectives' questions were later used by the prosecution to justify a

15  warrantless search and seizure of the voluminous personal property that was derivative evidence of the unlawfully

16  obtained statement.

17        184.  Detectives Hansen, Glen and Hitchcock further failed to record or adequately document their

18  interrogation of Mr. Garcia leading to vague and conflicting accounts in their respective reports and subsequent

19  testimony.

20        185.  Mr. Garcia's unlawfully obtained statements and the derivative evidence was later used by

21  prosecutors to justify the additional criminal charges against Mr. Garcia—including capital murder. This

22  unlawfully obtained evidence also formed the basis of Mr. Garcia's wrongful conviction and was repeatedly

23  referenced by the Court of Appeal in their opinion upholding his conviction and sentence.

24        186.  The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by evil

25  intent, done in bad faith, and/or involved callous indifference to Mr. Garcia's federally protected rights. These acts

26  were perpetrated while Defendants were acting in their capacities as employees or agents of the City and County of

27  Sacramento and under color of state law.

28        187.  As a direct and proximate result of Defendants' unlawful actions, Mr. Garcia was deprived of his

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL          PAGE 34

1 personal property, wrongly prosecuted, detained, and incarcerated for over eleven and a half years and suffered the

2 other grievous injuries and damages set forth above.

### SECOND CAUSE OF ACTION
#### 42 U.S.C. §1983 (Civil Rights Act)
#### Claim for Unlawful Warrantless Search and Seizure of Private Property in Violation of the Fourth Amendment to the United States Constitution

188.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth

herein, and further alleges as follows:

189.    The Fourth Amendment to the United States Constitution provides that: "The right of the people

to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly

describing the place to be searched, and the persons or things to be seized." (*U.S. Const. amend. IV.*)  The Fourth

Amendment is applicable to state officials through the Due Process Clause of the Fourteenth Amendment. (See

*Wolf v. Colorado* (1949) 338 U.S. 25, 27-28, overruled on other grounds by *Mapp v. Ohio* (1961) 367 U.S. 643.)

190.    Every search or seizure by a government agent must be reasonable, and the Fourth Amendment

imposes a presumptive warrant requirement for search and seizures. (*Katz v. United States* (1967) 389 U.S. 347,

357.) The Fourth Amendment classifies a warrantless search or seizure as unreasonable unless it falls within a

clearly recognized exception. (*Missouri v. McNeely* (2013) 569 U.S. 141, 148.)

191.    On March 2, 2009, Sacramento Police Detectives Hansen, Glen, and Hitchcock arrested Mr.

Garcia inside a private residence. Mr. Garcia was taken into custody without incident and sat on an ottoman by the

front door. Their sole objective was to arrest Mr. Garcia pursuant to an out-of-county arrest warrant. Despite

having achieved their objective, the detectives failed to leave and instead remained inside the private residence for

an additional 30 minutes while they conducted an extensive warrantless search of the entire home and its contents.

192.    The Sacramento Detectives searched every room in the residence including closed closets and

drawers within the master bedroom, where Mr. Garcia was staying, and the detectives found numerous luggage on

and around the bed. The Detectives asked Messrs. Garcia and Shahbazian to whom the property belonged and both

men identified their respective pieces of property. Messrs. Garcia and Shahbazian also specifically objected to the

detectives searching the contents of their luggage without a search warrant.

193.    Detective Hitchcock called the owner of the residence, Mr. Seitze, who confirmed that both

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL          PAGE 35

1    Messrs. Garcia and Shahbazian were his invited overnight guests in his home. Mr. Seitze further confirmed that all

2    the luggage found by detectives in the master bedroom belonged to Mr. Garcia and/or Mr. Shahbazian. At no time

3    did Mr. Seitze give officers consent to search the contents of the luggage or ask that any of the property be removed

4    from his home.

5            194.    As an overnight guest, Mr. Garcia had a reasonable expectation of privacy in his personal property

6    within the private residence. At no time did Mr. Garcia abandon his property or waive his expectation of privacy.

7    Mr. Garcia remained at all times adamantly opposed to the search and/or seizure of his personal property.

8            195.    The detectives nevertheless opened the closed pieces of luggage and searched their contents.

9    Inside of several pieces of luggage the detectives found various electronic devices including laptop computers,

10   cellular phones, and numerous hard drives.

11           196.    Sergeant Gautier instructed the detectives to seize "anything they felt was of evidentiary value to

12   the Palm Springs Police Department" including all of Mr. Garcia's property **without a search warrant**. Sergeant

13   Gautier stated that the Palm Springs Police Department could obtain their own search warrant at a later time

14   **post-seizure**. There was no justification for the warrantless search and seizure of the property as the search occurred

15   at 1:30 p.m. on a Monday afternoon when the Superior Court was in session and a search warrant could have been

16   obtained. There were no exigent circumstances justifying the warrantless search.

17           197.    Defendants performed the above-described acts under color of state law while acting in their

18   capacities as employees or agents of the City and/or County of Sacramento. The foregoing acts and omissions were

19   deliberate, intentional, reckless, wanton, cruel, done in bad faith, and/or involved willful indifference to

20   Mr. Garcia's legally protected rights. No reasonable officer in 2009 would have believed this conduct was lawful.

21           198.    As a direct and proximate result of Defendants' actions, Mr. Garcia was deprived of his Fourth

22   Amendment right to privacy and to be secure from unreasonable and warrantless search and seizures. His property

23   was seized and unlawfully disposed of.

24                                     **THIRD CAUSE OF ACTION**
                 **Claim Under California State Law Pursuant to Civil Code §52.1 (Tom Bane Civil Rights Act) for Denial of**
25               **the Right to Assistance of Counsel Upon Arrest in Violation of the Laws and Constitution of the State of**
                                              **California**
26

27           199.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth

28   herein, and further alleges as follows:


VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL            PAGE 36

200.    In order to ensure that a person may seek the assistance of counsel following arrest, California has enacted several statutory measures to facilitate communication between an arrestee and that person's attorney.

201.    California Penal Code §851.5 establishes a legal right for a person to make three completed telephone calls within three (3) hours of arrest. It also makes it a misdemeanor to willfully deprive an arrestee of the right to make telephone calls. Officers who violate a defendant's right to make a phone call do not have immunity for that action and may be sued for damages. (*Carlo v. City of Chino* (9th Cir. 1997) 105 F.3d. 493.)

202.    In addition, California Penal Code §825(b) makes it a misdemeanor for any officer having custody of an arrested person to willfully refuse or neglect to allow the arrested person's attorney to visit the prisoner. In addition, the arrestee may recover $500 in damages from the officer. (Pen. Code §825(b).)

203.    Mr. Garcia was booked into the Sacramento County Jail at approximately 2:00 p.m. on March 9, 2009. He repeatedly asked Detective Hitchcock if he could call his attorneys, to which he was told he would be allowed after he was housed. Even after booking was completed and Mr. Garcia was housed in the jail, he was not permitted to call any of his attorneys, or a bail bondsman.

204.    In addition, Mr. Garcia was repeatedly moved within the Downtown Sacramento County Jail and to a separate facility in Elk Grove, effectively holding him incommunicado which made it impossible for Mr. Garcia's attorneys to locate him and schedule a visit.

205.    Defendants performed the above-described acts intentionally and in a deliberate effort to prevent Mr. Garcia from communicating with his attorneys to seek their counsel. This unlawful tactic is commonly referred to as "keeping the suspect on ice" where law enforcement intentionally frustrates any efforts for an arrestee to communicate with their attorney in order to provide officers additional time to investigate or interrogate the suspect. By preventing Mr. Garcia from contacting his attorneys, Defendants "kept him on ice" for five days until Detective Browning of the Palm Springs Police Department could interrogate him.

206.    Defendants performed the above-described acts under color of state law, deliberately, intentionally, with malice, and deliberate indifference to Mr. Garcia's clearly established rights. No reasonable officer in 2009 would have believed this conduct was lawful.

207.    As a direct and proximate result of Defendants' actions, Mr. Garcia suffered prolonged detention and was subjected to an unlawful interrogation that formed the basis for additional charges, was maliciously prosecuted, convicted, sentenced to life in prison, incarcerated for over eleven and a half years, and suffered other

1    grievous injuries and damages as set forth above.

2    **FOURTH CAUSE OF ACTION**
**Claim Under California State Law Pursuant to Civil Code §52.1 (Tom Bane Civil Rights Act) for Denial of**
3    **the Right to be Released on Bail in Violation of the Laws and Constitution of the State of California**

4    208.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth

5    herein, and further alleges as follows:

6    209.    Bail permits a defended to be released from actual custody into the constructive custody of a

7    surety on a bond given to procure the defendant's release. The California Constitution, like the Federal Constitution,

8    prohibits the imposition of excessive bail to be required for the release of a criminal defendant. (*Cal. Const. art. I,*

9    *§12.*) In addition, the California Constitution goes further than the Eighth Amendment and specifically establishes a

10   state constitutional right to be released on bail, or on own recognizance at the discretion of the court. (*Id.*)

11   210.    When a court issues a warrant for the arrest of a criminal defendant, it must specify the amount of

12   bail set on the warrant. (Penal Code §815a.)

13   211.    The officer in charge of a jail, a designated employee of the police or sheriff's department, the

14   superior court clerk of the county of arrest, or the clerk in the county in which the warrant was issued may accept

15   bail in the amount fixed by the complaint, warrant, or bail schedule; order the release of the arrestee; and issue a

16   notice to appear. (Penal Code §1259b(a).) An officer's refusal to accept bail properly offered, or to intentionally

17   interfere with a defendant's efforts to post bail to secure their release from custody, violates the defendant's

18   constitutional and statutory rights to release on bail. An officer lacks qualified immunity from such actions and

19   may be subject to suit.

20   212.    Mr. Garcia was arrested in the City and County of Sacramento on March 9, 2009, pursuant to a

21   felony arrest warrant issued by the Superior Court for Riverside County in case no. INF064492. The warrant affixed

22   Mr. Garcia's bail at $1,000,000 (one million dollars).

23   213.    After being arrested and booked into the Downtown Sacramento County Jail, Mr. Garcia was

24   never shown a copy of the arrest warrant, nor was he informed of the nature of the charges or the amount of his bail.

25   Defendants further denied Mr. Garcia's right to call his attorneys or a bail bondsman to attempt to post the bail and

26   secure his release.

27   214.    Defendants further failed to take Mr. Garcia before a local magistrate within 48 hours of arrest as

28   required by law which prevented Mr. Garcia from requesting an examination of the bail in a "*Nebbia* hearing" as

1   specified in Penal Code §1275.1. As a consequence, Mr. Garcia could not post bail to secure his release. (See

2   *Nebbia v. United States* (2nd Cir. 1966) 357 F.2d 303.)

3        215.    Defendants performed the above-described acts under color of state law while acting in their

4   capacities as employees or agents of the City and/or County of Sacramento. The foregoing acts and omissions were

5   deliberate, intentional, reckless, wanton, cruel, done in bad faith, and/or involved willful indifference to Mr.

6   Garcia's legally protected rights. No reasonable officer in 2009 would have believed this conduct was lawful.

7        216.    As a direct and proximate result of Defendants' actions, Mr. Garcia was denied his right to be free

8   from custody on bail, suffered prolonged detention, and the other grievous injuries and damages set forth above.

9
**FIFTH CAUSE OF ACTION**
**Claim Under California State Law Pursuant to Civil Code §52.1 (Tom Bane Civil Rights Act) for Unlawful**
10   **Detention Caused by Delay in Arraignment in Violation of the Laws and Constitutions of the State of**
**California and the United States**

11

12        217.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth

13   herein, and further alleges as follows:

14        218.    An individual accused of a public offense has the right under the U.S. Constitution to be

15   informed of the "nature and cause of the accusation." (*U.S. Const. amend VI.*) Arraignment serves the purpose and

16   gives the accused a fair opportunity to plead to the charges. (*Cal. Const. art. I, §14; In re Mitchell* (1961) 56

17   Cal.2d. 667.) In addition, both federal and state constitutions grant an accused the right to a speedy trial. (*U.S.*

18   *Const. amend. VI; Cal. Const. art. I, §15*; Pen. Code §1382.) A prompt arraignment is a component of the right to a

19   speedy trial.

20        219.    The filing of a felony complaint must be followed by a prompt arraignment "without unnecessary

21   delay." (Pen. Code §§976, 860.) When an individual is arrested and held in custody, the term "without unnecessary

22   delay" means no more than "48 hours after [the] arrest, excluding Sundays and holidays." (Pen. Code §825; Code

23   Civ. Proc. §§134-135; *People v. Lee* (1970 ) 3 Cal.App.3d. 514, 521.)

24        220.    A defendant who is arrested on a felony charge in a county other than the one in which the

25   alleged crime occurred has the right to be arraigned *without unnecessary delay* in the county in which the arrest

26   occurred. (Pen. Code §821.) The arresting officer must inform the defendant of this right in writing. (*Id.*) If the

27   arrest warrant sets a bail amount, the magistrate must admit the defendant to bail in that amount and set a date by

28   which the defendant is required to appear before the magistrate or court who issued the warrant—not to exceed

1    25 days.

2    221.    An unreasonable delay between arrest and arraignment converts a lawful arrest into an unlawful

3    detention. (*People v. Pettingill* (1978) 21 Cal. 3d 231.) An unreasonable delay in bringing the defendant before the

4    magistrate may serve as a ground for a civil suit against the arresting officer. (*Dragna v. White* (1955) 45 Cal.2d

5    469.)

6    222.    On March 2, 2009, a felony complaint was filed in the Superior Court for the County of

7    Riverside in case no. INF064492, charging Mr. Garcia with one count each of felony grand theft (Pen. Code §487)

8    and identity theft (Pen. Code §530.5). An arrest warrant was also issued and affixed Mr. Garcia's bail at $1,000,000

9    (one million dollars).

10    223.    On March 9, 2009, at approximately 1:30 p.m., Defendants Gautier, Glen, Hansen, and

11    Hitchcock arrested Mr. Garcia pursuant to the aforementioned out-of-county arrest warrant. Mr. Garcia repeatedly

12    asked to see a copy of the arrest warrant and to know the cause for his arrest; however, Defendants failed to

13    provide the warrant or inform Mr. Garcia of the charges.

14    224.    Upon information and belief, Defendant Hitchcock booked Mr. Garcia into the Downtown

15    Sacramento County Jail at approximately 2:00 p.m. on March 9, 2009. Defendant Hitchcock failed to inform Mr.

16    Garcia in writing, as required by Penal Code §821, of his right to appear before a local magistrate within 48 hours.

17    225.    Mr. Garcia's arrest occurred during business hours on March 9, 2009—a Monday—and court was

18    in session in Sacramento County. Mr. Garcia had a legal right to be brought "without unnecessary delay" before a

19    local magistrate, within 48 hours, for arraignment. Such an arraignment should have taken place by no later than

20    1:30 p.m. on Wednesday, March 11, 2009. However, Defendants failed to take Mr. Garcia before a local magistrate

21    as required, thereby converting his otherwise lawful arrest into an *unlawful detention*.

22    226.    Defendants in fact **never** took Mr. Garcia before a local magistrate and instead held him in

23    unlawful detention for five days before suddenly, and without notice, placing him on a bus on March 13, 2009 for

24    transport to Riverside County. Mr. Garcia was ultimately not brought before a magistrate until Monday, March 16,

25    2009—seven days after his arrest.

26    227.    Defendants performed the above-described acts and omissions under color of state law,

27    deliberately, intentionally, with malice, and with reckless indifference to Mr. Garcia's clearly established legal

28    rights. No reasonable officer in 2009 would have believed this conduct was lawful.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL          PAGE 40

228.    As a direct and proximate result of Defendants' conduct, Mr. Garcia was unlawfully detained during which he was subjected to improper police interrogation that formed the basis for the filing of additional charges. But for Defendants' misconduct, Mr. Garcia would not have been falsely charged, maliciously prosecuted, tried, wrongfully convicted, an incarcerated for over eleven and a half years.

**SIXTH CAUSE OF ACTION**
**California State Tort Claim for Trespass to Personal Property and Conversion**
**in Violation of Civil Code Sections 3336 and 3355**

229.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

230.    On March 9, 2009, Defendants unlawfully seized Mr. Garcia's personal property inside of a private residence without a search warrant or other legal excuse. Defendants wrongfully took the property of Mr. Garcia and intentionally interfered with his lawful possession and enjoyment of said property. Defendants' intentional meddling with Mr. Garcia's possessory interest by unlawfully taking and withholding his personal property constitutes the tort of trespass to personal property.

231.    In addition to unlawfully seizing Mr. Garcia's property, Defendants intentionally, deliberately, and willfully refused to return said property upon demand. On or about March 11, 2009, Mr. Garcia's power of attorney contacted the Sacramento Police Department's evidence room to request the release and return of Mr. Garcia's personal property. Defendants later claimed they had been asked by the District Attorney—presumably from Riverside County—not to release the property. There was no valid court order authorizing the continued retention of the property or other legal prohibition to releasing the property back to Mr. Garcia via his duly appointed agent. The wrongful retention of Mr. Garcia's personal property by Defendants constitutes the tort of conversion.

232.    On or about March 17, 2009, Defendants did knowingly and intentionally convert Mr. Garcia's personal property by transferring it to the custody of the Palm Springs Police Department with the intent to permanently deprive Mr. Garcia of the possession and use of his personal property.

233.    Defendant Hansen contacted Defendant Poirier, who worked as an officer in the Sacramento Police Department's property room and authorized the release of all of Mr. Garcia's private property to the Palm Springs Police Department. Defendant Richardson, another officer in the property room, then physically released all of the unlawfully seized property to Palm Springs Police Department Detective Frank Browning.

234.    Despite repeated demands from Mr. Garcia, both the Defendants and the Palm Springs Police Department have refused to return the personal property unlawfully taken from Mr. Garcia. They have also failed to compensate Mr. Garcia for the replacement value of the property.

235.    Amongst the property wrongfully taken from Mr. Garcia was over $2,000 (two thousand dollars) in U.S. currency, several pieces of Louis Vuitton luggage, a laptop computer, various electronic devices and accessories, jewelry, a platinum Mont Blanc pen, assorted clothing and personal effects, his U.S. passport, and other small bags. The approximate full replacement value for these items taken is $35,000 (thirty-five thousand U.S. dollars).

236.    In addition to the physical property taken, the Defendants also deprived Mr. Garcia of the voluminous electronic records and data contained on the various electronic storage devices. Approximately 8TB (eight terabytes) of data were taken including irreplaceable records such as thousands of personal pictures and documents from throughout Mr. Garcia's life. Additionally, all of the business records pertaining to Mr. Garcia's proprietary technology called *The Hydra Project*, including the design, schematics, white paper, source code, results of experiments, results of the alpha and beta testing, business plan and financial prospectus, were all wrongfully taken and retained by Defendants constituting a further tort for conversion.

237.    As a consequence of Defendants' wrongful actions, Mr. Garcia was prevented from pursuing lucrative contracts to license his innovative technology causing him substantial financial losses. A similar, but less effective, system to Mr. Garcia's *The Hydra Project* developed by technology entrepreneur Hank Asher, came at a reported cost of over $100 million to develop and was sold for $775 million in 2013. Other ventures backed by private companies and governmental agencies alike have also come at substantial costs with limited success. Given the tremendous success of *The Hydra Project* at effectively detecting and tracking illicit file types such as child pornography, terrorist materials, and pirated content, it would have likely become a dominant force in the marketplace had Mr. Garcia been able to continue its development. However, due to Defendant's actions, Mr. Garcia, via his surrogates, was unable to license or sell *The Hydra Project*'s technology.

238.    As a direct and proximate result of the wrongful acts of Defendants as described above, Plaintiff has suffered special damages in excess of $100,000,000 (one-hundred million dollars) and general damages of $20,000,000 (twenty-million dollars).

**SEVENTH CAUSE OF ACTION**
**42 U.S.C. SECTION 1983 (Civil Rights Action)**
**Claim Pursuant to *Tatum v. Moody* for Failure to Disclose Highly Significant Exculpatory Information**
**Leading to Plaintiff's Continued Detention**

239. Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

240. Pursuant to *Tatum v. Moody* (9th Cir. 2014) 768 F. 3d 806 cert. denied, (2015) 135 S.Ct. 2312, Defendants failed to disclose exculpatory evidence to prosecutors leading to Mr. Garcia's lengthy detention in violation of Mr. Garcia's constitutional right to due process. (*United States v. Bagley* (1985) 473 U.S. 667 (government's duty to disclose favorable evidence under Brady arises regardless of whether the defendant is aware of or makes a request for the evidence.).)

241. As mentioned above, Defendants failed to disclose that while searching for Mr. Garcia at Matthew Herip's apartment, they found virtually all of the property prosecutors had falsely accused Mr. Garcia of fraudulently purchasing utilizing Mr. Lambert's credit cards. On March 5, 2009, the Defendants conducted an extensive search of Mr. Herip's small one-bedroom apartment, and they found a suspicious amount of brand new property—much still in their original packaging or with price tags still attached—including the following:

    a. a large Sony LED flat screen television;

    b. a tanning bed by the front door;

    c. copious amounts of designer clothing;

    d. numerous Apple electronic devices including a new MacBook Air laptop computer, a MacBook Pro laptop computer, a Mac Mini computer, an Apple Cinema Display, and several accessories.

All of these items had been identified by investigators as having been purchased with Mr. Lambert's credit cards after his disappearance.

242. Also inside of Mr. Herip's apartment, Defendants found three fur coats with the name "Cliff Lambert" embroidered inside, several pieces of structured luggage from Louis Vuitton's Monogram Collection, and an ornate Tiffany & Co. clock. All of the aforementioned items were alleged by prosecutors to have gone missing from Mr. Lambert's Palm Springs residence—over 500 miles away—after his mysterious disappearance in early December 2008. There was no sensical reason why Mr. Herip would be in possession of valuable personal property of a man he claims to have never met.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL          PAGE 43

243.     Defendants Hansen, Glen, and Hitchcock later testified that they became aware that a white Apple laptop computer belonging to Mr. Lambert was missing, and therefore recognized Apple products as potentially having evidentiary value. However, Defendants never mentioned in their official reports or during their testimony that they found numerous Apple products, including several computers, inside Mr. Herip's apartment. It also appears, that Defendants made no attempts to question Mr. Herip on how he obtained the products, or to check serial numbers, or take photographs of the items.

244.     Defendants further failed to disclose that during their warrantless search and seizure of voluminous property following Mr. Garcia's arrest, Alexander Shahbazian claimed ownership of two Apple MacBook Pro laptop computers—one of which was later identified by investigators as having been purchased with Mr. Lambert's credit card. They also failed to disclose a recorded telephone call to the Sacramento Police Department's evidence room in which Mr. Shahbazian again claimed ownership and requested the release of the computers to him.

245.     Defendants claimed they knew Mr. Garcia was wanted on a $1,000,000 (one-million dollar) arrest warrant for charges of identity theft and grand theft related to the use of Mr. Lambert's credit cards. They also knew Mr. Lambert was believed to have been murdered and an Apple laptop computer was missing. Defendants were experienced veteran detectives who, given the seriousness of the case, should have reasonably recognized the relevancy and importance of the aforementioned evidence. Yet, Defendants never disclosed the information to prosecutors or during their extensive court testimony.

246.     Had Defendants disclosed what they had discovered, this evidence would have impeached Mr. Herip's testimony, tended to prove Mr. Garcia's innocence, cast doubt on the entire police investigation and prosecution, and led to the end of Mr. Garcia's unjust pretrial detention.

247.     Defendants performed the above described acts and omissions under color of state law, deliberately, intentionally, with malice or reckless disregard for the truth and with deliberate indifference to Mr. Garcia's clearly established constitutional rights. No reasonable officer in 2009 would have believed this conduct was lawful.

248.     As a direct and proximate result of Defendants' conduct, Mr. Garcia was wrongly and maliciously prosecuted, denied bail, bound over for trial, and suffered a prolonged pre-trial detention during the more than three and a half years that he was jailed, from March 9, 2009 until October 12, 2012, as well as the other

1  grievous and continuing damages and injuries set forth above.

2  **EIGHTH CAUSE OF ACTION**
**42 U.S.C. SECTION 1983 (Civil Rights Action)**
3  **Claim for Conspiracy to Violate Civil Rights as Secured Under the United States Constitution and Acts of Congress**

4  249.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth

5  herein, and further alleges as follows:

6  250.    In addition to creating a cause of action under 42 U.S.C. §1983 to seek relief for violations of

7  clearly established federal civil rights by government officials acting under color of state law, the Civil Rights Act

8  also enacted 42 U.S.C. §1985 to hold accountable two or more persons who conspire together to violate the same

9  rights. (See *Holgate v. Baldwin* (9th Cir. 2005) 425 F.3d 671, 676.)

10  251.    Defendants and others yet unknown, agreed among themselves and others to act in concert to

11  deprive Mr. Garcia of his clearly established constitutional rights as protected by the Fourth, Fifth, Sixth, Eighth,

12  and Fourteenth Amendments, including his right to the assistance of counsel, to be released from custody upon

13  reasonable bail, to not be deprived of liberty without due process of law, and to be free from illegal search and

14  seizures.

15  252.    As described in detail above, in furtherance of the conspiracy, Defendants engaged in and

16  facilitated numerous over acts including, but not limited to the following:

17      a.   Acting in concert to violate Mr. Garcia's right to privacy by using force, intimidation, and

18          deception to make an unlawful and warrantless entry into a private residence;

19      b.   Acting in concert to unlawfully seize and deprive Mr. Garcia of his property and injure its

20          value;

21      c.   Acting in concert to use fear, threats, and intimidation to subject Mr. Garcia to an unlawful

22          interrogation without his attorney's knowledge, presence or consent;

23      d.   Acting in concert to prolong Mr. Garcia's unlawful detention by refusing to timely take him

24          before a magistrate for arraignment or allow him to post bail;

25      e.   Acting in concert to hold Mr. Garcia incommunicado by repeatedly moving him to different

26          locations and denying him phone access to prevent him from contacting his attorneys; and

27      f.   Acting in concert to conceal their discovery of exculpatory evidence that Matthew Herip and

28          Alexander Shahbazian were in possession of the property purchased with Mr. Lambert's

1    credit cards.

2    253.    Defendants acted in concert and coordination with one another with a common purpose to

3    impede, hinder, obstruct, or defeat, the due course of justice, with intent to deny Mr. Garcia—a citizen—the equal

4    protection of the laws and to injure him and his property. Defendants' actions were done deliberately and

5    intentionally and accompanied by force, fear, intimidation, and/or threats.

6    254.    As a direct and proximate result of Defendants' overt acts, Mr. Garcia was deprived of his

7    constitutional rights; wrongfully prosecuted, detained, and incarcerated for over eleven and a half years; deprived

8    of his private property, and subjected to other grievous injuries and damages as set forth above.

9
**NINTH CAUSE OF ACTION**
**42 U.S.C. SECTION 1983 (Civil Rights Action)**
10    *Monell* **Claim Against the City and County of Sacramento for Failure to Train, Supervise and/or**
**Discipline In Constitutionally Adequate Investigative Techniques, Arrests, Interrogations, Search and**
11    **Seizures and/or** *Brady* **Duties**

12    255.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth

13    herein, and further alleges as follows:

14    256.    The legal definition of a "person" under §1983 includes actual people (e.g. police officers,

15    wardens, prosecutors, etc.) as well as local governments and municipalities. (See *Monell v. Department of Social*

16    *Services* (1978) 436 U.S. 658, 690; see e.g., *Jackson v. Barnes* (9th Cir. 2014) 749 F.3d 755, 764 (plaintiff could

17    seek redress against sheriff's department because conducting criminal investigation renders department "county

18    actor" under §1983).)

19    257.    However, in order to be liable under §1983 there must be a direct causal link between deliberate

20    municipal action and the deprivation of federal rights. (See *Board of City Commissioners v. Brown* (1997) 520 U.S.

21    397, 404; see, e.g. *Haley v. City of Boston* (1st Cir. 2011) 657 F.3d 39, 51, (allegations that city's police department

22    had unconstitutional policy and failed to train personnel in evidence disclosure obligations both sufficient to state

23    §1983 claim against city); *Jauch v. Choctaw County* (5th Cir. 2017) 874 F.3d 425, 435 (county liable under §1983

24    for sheriff policy of unconstitutional pretrial detention.).)

25    258.    The City and County of Sacramento, by and through their policymakers, created and maintained

26    a custom, policy, and/or practice of failing to train, supervise and/or discipline their employees and agents,

27    including Defendants, regarding constitutionally adequate investigation techniques.

28    259.    The City and County of Sacramento, by and through their policymakers, created and maintained a

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL          PAGE 46

1  custom, policy, and/or practice of failing to train, supervise, and/or discipline their employees and agents, including

2  Defendants, regarding proper procedures following arrest and to ensure that arrestees are provided a copy of the

3  warrant, informed of the charges, advised of their rights, allowed to call their attorney, and arraigned within 48

4  hours of arrest.

5        260.    The City and County of Sacramento, by and through their policymakers, created and maintained

6  a custom, policy, and/or practice of failing to train, supervise, and/or discipline their employees or agents, including

7  Defendants, in constitutionally proper custodial interrogation procedures including the advisement of *Miranda*

8  rights before initiating questioning and to refrain from coercive tactics.

9        261.    The City and County of Sacramento, by and through their policymakers, created and maintained a

10 custom, policy, and/or practice of failing to train, supervise, and/or discipline their employees and agents, including

11 Defendants, regarding constitutionally proper search and seizure procedures including the warrant requirement,

12 arms-reach rule, container doctrine, and photographing and/or documenting the area searched and items seized.

13       262.    The City and County of Sacramento, by and through their policymakers, created and maintained a

14 custom, policy, and/or practice of failing to train, supervise, and/or discipline their employees and agents, including

15 Defendants, regarding their obligation to document and disclose exculpatory evidence pursuant to their *Brady*[4]

16 obligations.

17       263.    The unconstitutional customs, policies, patterns, and practices of the City and County of

18 Sacramento have caused numerous individuals to be subjected to prolonged detentions, unlawfully deprived of

19 property, and wrongfully convicted. In addition to Mr. Garcia, individuals who suffered these constitutional

20 violations including:

21       a.    According to the National Registry of Exonerations, six individuals were wrongfully

22         convicted in Sacramento County and have had their convictions overturned:

| Name/Age | Crime/Sentence | Year Convicted | Year Exonerated | Factors Affected Wrongful Conviction |
|---|---|---|---|---|
| Zavion Johnson, age 18 | Murder – 25 to Life | 2002 | 2018 | False or Misleading Forensic Evidence |
| Gloria Killian, age 35 | Murder – 32 to Life | 1986 | 2002 | Official Misconduct: Perjury or False Accusation |

[4] *Brady v. Maryland* (1963) 373 U.S. 83.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL    PAGE 47

| Jeremy Puckett, age 21 | Murder – Life without Parole | 2002 | 2020 | Official Misconduct: Perjury or False Accusation, Inadequate Legal Defense; Mistaken Witness Identification |
| David Quindt, age 21 | Murder – not sentenced | 1999 | 2000 | Mistaken Witness Identification |
| Kenneth Turner, age 30 | Murder – not sentenced | 1995 | 1995 | Mistaken Witness Identification |
| Richard Williams, age 18 | Murder – Life without Parole | 1998 | 2015 | Mistaken Witness Identification |

      b.    Additionally, both the City and County of Sacramento have been repeatedly sued in federal court for civil rights violations pertaining to the unlawful conduct of law enforcement officials.

264.    These unconstitutional customs, policies and practices of the City and County of Sacramento proximately and directly caused Mr. Garcia's physical and constitutional injuries, including his unlawful detention, malicious prosecution, unfair trial, wrongful conviction, illegal confinement, loss of property, and other damages described above.

**TENTH CAUSE OF ACTION**
**42 U.S.C. SECTION 1983 (Civil Rights Action)**
**Supervisory Liability Claim Against Defendants Rick Gautier, John Doe No. 1, and John Does Nos. 2-5.**

265.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

266.    Mr. Garcia's unlawful detention, delay in arraignment, extradition, prosecution, trial, wrongful conviction, and prolonged incarceration was caused by the unconstitutional actions and inactions of Defendants Rick Gautier, John Doe 1, and John/Jane Does 2 through 5, acting in their individual capacities and under color of state law.

267.    Upon information and belief, Defendants Gautier, John Doe 1, and John/Jane Does 2 through 5 directly participated in the misconduct that resulted in Mr. Garcia's wrongful conviction, including but not limited to unlawfully seizing his property, denying Mr. Garcia the right to counsel, not allowing him to post bail, delaying arraignment, holding him in unlawful detention, subjecting him to improper interrogation, and suppressing exculpatory information.

268.    Defendants Gautier, John Doe 1, and John/Jane Does 2 through 5 knowingly refused to terminate the wrongful prosecution of Mr. Garcia, which, upon information and belief, they knew or should have known was

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL      PAGE 48

based on the unlawfully seized evidence, and the coerced and false statement of Mr. Garcia and in spite of suppressed exculpatory information. As a result, Gautier, John Doe 1, and John/Jane Does 2 through 5 knew or reasonably should have known that Mr. Garcia's constitutional rights to be free from unreasonable seizure and not to be deprived of liberty without due process of law would be violated.

269.    Defendants Gautier, John Doe 1, and John/Jane Does 2 through 5 culpably failed to adequately train, supervise, and/or control their subordinates, who unlawfully seized property, denied Mr. Garcia the right to counsel, refused to allow him to post bail, delayed his arraignment, held him in unlawful detention, subjected him to improper interrogation, and suppressed exculpatory information.

270.    Defendants Gautier, John Doe 1, and John/Jane Does 2 through 5 violated Mr. Garcia's constitutional rights by acquiescing in the deprivation of Mr. Garcia's rights by their subordinates, and by generally showing a reckless or callous indifference to Mr. Garcia's protected rights.

271.    Defendants Gautier, John Doe 1, and John/Jane Does 2 through 5 failure to train, supervise, and/or control their subordinates, their indifference to the actions of their subordinates, and their deliberate indifference to Mr. Garcia's rights, encouraged and permitted their subordinates to do the egregious acts described above, including failing to document and to disclose exculpatory evidence.

272.    The acts and omissions of Defendants Gautier, John Doe 1, and John/Jane Does 2 through 5, in their individual capacities and while acting under color of state law, caused Mr. Garcia to suffer the constitutional deprivations and grievous personal injuries and damages described above.

**ELEVENTH CAUSE OF ACTION**
**Claim Under California State Law Pursuant to Government Code Section 815.2 For Respondeat Superior and Vicarious Liability Against the City and County of Sacramento**

273.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

274.    Mr. Garcia suffered the aforementioned injuries as a direct and proximate result of the misconduct of the individual Defendants.

275.    During all relevant times, Defendants were employees of either the Sacramento Police Department or the Sacramento County Sheriff's Department and the City and/or County of Sacramento.

276.    The acts and omissions of Defendants that proximately caused Mr. Garcia's injuries were within the scope of Defendants employment with the Sacramento Police Department or the Sacramento County Sheriff's

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL          PAGE 49

1  Department and the City and/or County of Sacramento.

2  **TWELFTH CAUSE OF ACTION**
**Claim For Declaratory and Injunctive Relief to Vindicate the Rights of Plaintiff and**
3  **to Permanently Enjoin the Defendants From Any Further Violations of Rights Protected by the Laws and**
**Constitution of the United States**

4       277.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth

5  herein, and further alleges as follows:

6       278.    The acts and omissions, as described in this Verified Complaint, were performed by Defendants,

7  individually and collectively, under color of state law, deliberately, intentionally, with malice or reckless disregard

8  for the truth, and with deliberate indifference to Mr. Garcia's clearly established constitutional rights.

9       279.    As a direct and proximate result of Defendants' unlawful conduct, Mr. Garcia suffered the

10 substantial and grievous damages and injuries as set forth above. In addition, Defendants' egregious misconduct

11 still continues unabated to this day, and for the foreseeable future. Unless and until enjoined and restrained by order

12 of this Court, Defendants continued violation of Mr. Garcia's legally protected rights as identified above will cause

13 Mr. Garcia great and irreparable injury. Mr. Garcia has no adequate remedy at law for the injuries being suffered,

14 in that a judgment for monetary damages alone will not end the continued harms being inflicted upon Mr. Garcia.

15       280.    Therefore, Mr. Garcia moves for this Court to grant declaratory and injunctive relief to declare

16 the rights and responsibilities of the parties and to permanently enjoin the Defendants from any continued and

17 prospective violation of Mr. Garcia's rights.

18       281.    In the order for declaratory judgment, Mr. Garcia moves that this Court specifically make the

19 following findings:

20       a.    On March 2, 2009, a felony complaint was filed in the Superior Court of the State of California

21            for the County of Riverside in case no. INF064492 charging Daniel Garcia with one count each

22            of grand theft (PC §487) and identity theft (PC §530.5). The Superior Court issued a warrant for

23            Mr. Garcia's arrest and affixed bail at $1,000,000 (one-million dollars).

24       b.    The filing of a felony complaint and issuance of an arrest warrant initiated a criminal cause of

25            action triggering Mr. Garcia's right to counsel under the Sixth Amendment.

26       c.    Mr. Garcia exercised his Sixth Amendment right to counsel by seeking the advice of attorneys

27            and privately retaining attorney Mario Rodriguez to specifically represent him in the criminal

28            case.

1    d.    Mr. Garcia's exercise of his Sixth Amendment right to counsel legally precluded law

2          enforcement from attempting to question Mr. Garcia about the charged offenses without the

3          knowledge, presence, and consent of his attorney

4    e.    On March 6, 2009, Palm Springs Police Department Detective Frank Browning was informed,

5          and acknowledged, that Mr. Garcia was represented by an attorney.

6    f.    All other law enforcement personnel are deemed to have constructive knowledge that Mr. Garcia

7          was represented by counsel.

8    g.    Mr. Garcia was under arrest, in handcuffs, and thus in custody at the time the Sacramento Police

9          Detectives questioned him on March 9, 2009.

10   h.    The Sacramento Police Detectives questioned Mr. Garcia regarding the ownership of property

11         they believed may be evidence of the charged offenses and their questions were intended to illicit

12         an incriminating response.

13   i.    The Sacramento Police Detectives' questioning of Mr. Garcia meets all the requirements of a

14         custodial interrogation by police.

15   j.    Mr. Garcia had a constitutional right under the Fifth Amendment to remain silent and to the

16         assistance of counsel during any questioning by police detectives.

17   k.    The Sacramento Police Detectives failed to advise Mr. Garcia of his rights under the Fifth

18         Amendment as required by *Miranda v. Arizona* (1966) 384 U.S. 436.

19   l.    The Sacramento Police Detectives' questioning of Mr. Garcia without proper admonishments

20         violated Mr. Garcia's Fifth Amendment rights.

21   m.    Furthermore, Detective Hansen's threats to break or cut open Mr. Garcia's luggage if he refused

22         to answer questions, constitutes coercion, and any response by Mr. Garcia is deemed involuntary.

23   n.    Separately, the Sacramento Police Detectives' interrogation of Mr. Garcia about evidence related

24         to the charged offenses without the knowledge, presence, and consent of his attorney violated Mr.

25         Garcia's Sixth Amendment right to the assistance of counsel.

26   o.    Mr. Garcia was an invited overnight guest at the home of Nicholas Seitze located at 623 19th

27         Street, Sacramento, California. As an overnight guest, Mr. Garcia had a reasonable expectation of

28         privacy in his personal effects and property.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL        PAGE 51

p.   The Sacramento Police Detectives did not have a warrant to search or seize any of Mr. Garcia's personal property.

q.   There were no exigent circumstances justifying the warrantless search and seizure of Mr. Garcia's personal property.

r.   The Sacramento Police Detectives did not have consent to search or seize Mr. Garcia's property.

s.   At no time did Mr. Garcia abandon his personal property or forfeit his expectation of privacy and ownership rights in his personal property.

t.   The Sacramento Police Department's seizure of Mr. Garcia's personal property from inside a private residence without a search warrant or exigent circumstances was unreasonable and in violation of Mr. Garcia's Fourth Amendment rights.

u.   The Palm Springs Police Department obtaining a search warrant **post-seizure** for Mr. Garcia's personal property did not dissipate the original taint caused by the initial unlawful search and seizure by the Sacramento Police Department.

v.   Mr. Garcia is legally entitled to the return of his personal property that was unlawfully seized by Sacramento Police Detectives. The Sacramento Police Department is required to retrieve Mr. Garcia's property and return it to him forthwith.

w.   Mr. Garcia is entitled to the full replacement value for any property lost or damaged, as well as to full compensation for the diminished value of the property that was unlawfully converted.

x.   The failure to bring Mr. Garcia before a local magistrate within 48 hours following arrest for a prompt arraignment violated Mr. Garcia's right to due process and a speedy trial under the Fourteenth and Sixth Amendments.

y.   The Sacramento Police Detectives' failure to document and disclose to the prosecution and defense obvious exculpatory evidence relevant to the charged offenses violated Mr. Garcia's right to due process under the Fourteenth Amendment.

**JURY DEMAND**

Pursuant to the Seventh Amendment to the United States Constitution, Mr. Garcia requests a jury trial on all issues and claims set forth in this Verified Complaint.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL          PAGE 52

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff Daniel Carlos Garcia respectfully requests:

1. An order issuing an emergency injunction to command and compel Defendants to immediately cease and desist their unlawful conduct and to restore the rights of Plaintiff;

2. An order declaring the rights and responsibility of the parties, and specifically finding that Defendants and their agents, officials, and employees violated the rights of Plaintiff as guaranteed by the Constitutions and laws of the United States of America and the State of California and that the actions of Defendants were unlawful;

3. An order permanently enjoining Defendants against any further unconstitutional treatment of Plaintiff, and commanding them to immediately recover and restore to Plaintiff all of the property Defendants unlawfully seized and converted;

4. A trial by jury on each of Plaintiff's claims;

5. That the Court award general and compensatory damages to Plaintiff and against Defendants, jointly and severally, in an amount to be determined at trial;

6. That the Court award punitive damages to Plaintiff, and against the individual Defendants, in an amount to be determined at trial, in order to deter such egregious and unlawful conduct by Defendants in the future;

7. For pre-judgment and post-judgment interest and recovery of costs, including the cost of this suit and litigation expenses including reasonable attorneys' fees pursuant to 42 U.S.C. §1988 for all 42 U.S.C. §1983, and §1985 claims;

8. That the Court award reasonable attorneys' fees and costs to Plaintiff as permitted by statute for each of the claims brought under California state laws; and

9. That the Court award such other and further relief as deemed appropriate and just.

Dated this 27 day of December 2020.

DANIEL CARLOS GARCIA
Plaintiff Pro Se

1

**VERIFICATION**

2

I, Daniel Carlos Garcia, declare as follows:

3

I am the Plaintiff in the above-entitled action.  I have prepared and read the foregoing Verified Complaint

4

for Declaratory and Injunctive Relief Under the Civil Rights Act and for Damages and assert that each of the factual

5

complaints alleged herein is accurate except as to those facts stated upon information and belief, and as to those

6

matters, I believe them to be true.

7

I declare under penalty of perjury under the laws of the United States of America and the State of

8

California that the foregoing is true and correct.

9

Executed this 2 7 day of December 2020, at Murietta, California.

10

11

Respectfully submitted,

12

13

By: _____

14

DANIEL CARLOS GARCIA
Plaintiff Pro Se

15

//

16

//

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL          PAGE 54

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATION AND CLOSING**

Under Federal Rules of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of Signing: _27_ day of December 2020, at Murietta, California.

Signature of Plaintiff: _____
                        DANIEL CARLOS GARCIA
                        Plaintiff Pro Se

//

//